RICHARD CREMA, DONALD MAXWELL, THE SOUTH JERSEY SHELLFISHERMAN'S ASSOCIATION, THE AMERICAN LITTORAL SOCIETY, AND THE SIERRA CLUB, NEW JERSEY CHAPTER, APPELLANTS, v. NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, THE COASTAL AREA REVIEW BOARD AND THE HISTORIC SMITHVILLE DEVELOPMENT COMPANY, RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued November 4, 1981—Decided January 20, 1982.

Before Judges BOTTER, ANTELL and FURMAN.

*Nathan M. Edelstein* argued the cause for appellants (*Fink, Lynette & Ford,* attorneys; *Nathan M. Edelstein* on the brief).

*John M. Van Dalen,* Deputy Attorney General, argued the cause for respondents New Jersey Department of Environmental Protection and The Coastal Area Review Board (*James R. Zazzali,* Attorney General of New Jersey, attorney; *John M. Van Dalen* of counsel and on the brief).

*James L. Cooper* argued the cause for respondent The Historic Smithville Development Company (*Cooper, Perskie, Katzman, April, Niedelman & Wagenheim,* attorneys; *James L. Cooper* of counsel; *Lewis S. Kurland* on the brief).

The opinion of the court was delivered by

ANTELL, J. A. D.

Plaintiffs are commercial shell fishermen and nonprofit corporations respectively concerned with protecting the interests of the commercial shell fishing industry and preservation of the environment. They appeal from a determination of the Division of Coastal Resources (DCR) within the Department of Environmental Protection (DEP) conditionally granting approval for a construction permit under the Coastal Area Facility Review Act, *N.J.S.A.* 13:19–1 et seq. (CAFRA) to respondent Historic Smithville Development Company (HSDC) in connection with a large-scale development in the vicinity of the Great Bay-Mullica River estuary. DCR's determination was affirmed by the Coastal Area Review Board (CARB) under *N.J.S.A.* 13:19–13. The conditional character of the permit granted is characterized by the agency as "conceptual" only, allowing of no actual construction until all prescribed statutory standards are satisfied.

In substance, plaintiffs contend on this appeal that authority for such conceptual approval is nowhere provided by CAFRA, that the permit was issued in violation of DEP's own regulation whereby the area in question was accorded a low-growth desig-

nation, and that it is basically in conflict with the State's coastal growth management strategy articulated in *N.J.S.A.* 13:19–1 *et seq.* and *N.J.A.C.* 7:7E–1.1 *et seq.* Plaintiffs further contend that the approval was granted without a foundation of factual findings necessary to assure the preservation of this environmentally sensitive area. The State responds that the necessary safeguards inhere in the condition that no concrete steps in the project may be taken without first satisfying the Department that an adverse impact on the area will not thereby result, and that conceptual approval represents a "factually reasonable and legally correct response to the unique demands placed on the administrative system by the large scale project."

On October 9, 1979 HSDC submitted its application for a CAFRA permit. The development proposed would be of a substantial size. It contemplates a 700-room hotel, 6,850 living units, 860,000 square feet of commercial and office space and the eventual introduction of a population of 20,000 people. As the decision under review notes, during a preapplication conference DCR decided that

> ... when an application was finally submitted, the project would be reviewed conceptually to determine whether growth at this scale could occur in this area without presenting adverse impacts to the environmentally sensitive features which led to the classification of the area's "Land Areas" as a "low growth" region ....

After a public hearing on April 2, 1980 the permit was "conceptually" approved by the DCR in accordance with its written decision of that date. Its issuance had been opposed not only by plaintiffs but by state and federal regulatory agencies such as the Division of Water Resources, the Bureau of Shellfish Control, the Office of Environmental Assessment, the Division of Fish, Game and Wildlife, the United States Fish and Wildlife Service, and the United States Environmental Protection Agency. All expressed grave reservations about the likely environmental impact, particularly as it related to air and water quality and wildlife habitat. Since plaintiffs' appeal was regarded by DEP as raising questions pertaining to matters of policy, it was

referred to CARB for review. From CARB's affirmance thereof plaintiffs appeal.

The project site is upstream from the Brigantine National Wildlife Refuge, an area of 20,564 acres dedicated to the preservation and protection of wildlife, birds and saltwater wetlands. It is situated above the Cohansey aquifer and is trisected by several important watercourses which flow either to the Mullica River or directly to the Great Bay, thus forming the Mullica River-Great Bay estuary, one of the last remaining commercially-viable shellfish areas in this part of the State.

The Refuge provides a unique habitat for black skimmer, peregrine falcons, osprey, bald eagles, terns and other endangered birds, as well as numerous other threatened species. Two-thirds of the Refuge consist of saltmarsh wetlands, with the remainder comprised of woodlands, meadows, pinestands, oak and other vegetation. It contains 1,600 acres of freshwater impoundment, assuring a unique freshwater habitat for birds and wildlife and serves as a buffer to preserve the quality of the Great Bay. Its character as a particularly fragile ecosystem is underscored by the fact that it has been assigned a low-growth designation by Department regulation. As the decision of the DCR particularly notes, such a designation "is heavily weighted against disturbance of the existing landscape in an area." It further acknowledges that "unless development potential is high and the site's environmental sensitivity is low or medium, no site disturbance or development is acceptable."

The nature of the approval granted by the Department is explained in the following language of the DCR decision:

This approval is conceptual. It does not give the applicant the right to commence site clearing, preparation, or any other construction activities related to the project beyond the work on the model units released by letter of June 13, 1980 from Director Kinsey. Every parcel of the project will require a complete submission under CAFRA as defined in the *CAFRA Procedural Rules and Regulations*, (N.J.A.C. 7:7D-2 et seq.), with a normal application review process including the required fact-finding public hearing.

This approval, however, encompasses the concept of the development of a Large Scale Planned Residential Development in the proposed location of the

portion of Galloway Township which has a "limited growth region" designation in the Land Area Location policies. Generally, the approval extends to the type of uses proposed and to the size of the proposed project in terms of the maximum number of units to be permitted, the maximum square footage of commercial and office space, and the minimum acreage of open space. In addition, this approval includes support of the general stormwater management plan, water supply plan, and wildlife/vegetation maintenance plan and controls.

The approval does not obligate any Department or Agency of the State of New Jersey to approve any parcel or component of the proposed development nor does it imply DEP approval under CAFRA of any subsequent submission for a construction permit application. The groundwater, surface water, traffic and air quality monitoring programs and data reporting specified as conditions to this approval shall be carried out as outlined, for the time periods specified. At some future date, if adverse effects develop which cannot be corrected, the size of the development will have to be restricted below that proposed in the Master Development Plan that is being granted a "conceptual" approval by this CAFRA permit decision. In addition, remedial measures may be required if significant adverse effects develop.

The foregoing language is excerpted from what is described by the DCR as a "Decision by the Director Conditionally Approving a CAFRA Permit." But the only "permit" which DEP may issue is that provided under *N.J.S.A.* 13:19–5 for the construction of a project.

Although a construction permit may be conditionally approved under CAFRA, a permit issued on condition that no construction take place is a contradiction in terms. *N.J.A.C.* 7:7D–2.2 defines "Permit" and "Permit condition" as follows:

"Permit" means any legal instrument, constituting permission to construct a facility in the coastal area, that is issued by the commissioner pursuant to N.J.S.A. 13:19–1 et seq.

"Permit condition" means a requirement of the permit after issuance, applicable during, and after construction.

See, also, *N.J.A.C.* 7:7D–2.5(b)x, which provides:

x. A permit shall be valid authority to commence construction of a facility for two years from the date of issuance of a permit. The division may, upon written request from the permittee, extend such authority for periods up to one year but not to exceed three such extensions. If construction does not commence and continue with this two-year period and no extension is granted, then the permit shall lapse;

In order for a permit to be issued under CAFRA, the Commissioner must comply with *N.J.S.A.* 13:19–10 and 11. *N.J.S.A.* 13:19–10 provides that the Commissioner may issue the permit only if he finds that the project

a. Conforms with all applicable air, water and radiation emission and effluent standards and all applicable water quality criteria and air quality standards.

b. Prevents air emissions and water effluents in excess of the existing dilution, assimilative, and recovery capacities of the air and water environments at the site and within the surrounding region.

c. Provides for the handling and disposal of litter, trash, and refuse in such a manner as to minimize adverse environmental effects and the threat to the public health, safety, and welfare.

d. Would result in minimal feasible impairment of the regenerative capacity of water aquifers or other ground or surface water supplies.

e. Would cause minimal feasible interference with the natural functioning of plant, animal, fish, and human life processes at the site and within the surrounding region.

f. Is located or constructed so as to neither endanger human life or property nor otherwise impair the public health, safety, and welfare.

g. Would result in minimal practicable degradation of unique or irreplaceable land types, historical or archeological areas, and existing scenic and aesthetic attributes at the site and within the surrounding region.

We do not agree that a permit to construct conditional upon no construction taking place until the rigorous and complex criteria of the statute have been satisfied is either expressly or impliedly authorized by the enabling legislation. Our view is supported by *N.J.A.C.* 7:7D–2.3(c), which makes such approval available only as part of an informal pre-application nonbinding conference with the Department. However, any comments made by the Division pertaining to such preliminary conceptual offerings are by regulation deemed not to "be construed as a decision of the Department." *N.J.A.C.* 7:7D–2.3(c)(5).

The character of the permit under review is materially different from that considered in *Public Interest Research Group v. State*, 152 *N.J.Super.* 191 (App.Div.), certif. den. 75 *N.J.* 538 (1977). Although we there affirmed the issuance of a conditional construction permit, it was only after determining that the Department's finding that the statutory criteria had been basically satisfied was supported by the available evidence. We expressly withheld any suggestion that DEP was "empowered to grant a permit, even a conditional one, without sufficient evidential support in the record." 152 *N.J.Super.* at 213. Here,

although the permit was granted, it requires applicant to satisfy the legislated requirements at some later time.

The fault to be found with the action taken by the agency is that conceptual approval, not being provided for by statute or regulation, is of so indefinite a nature that it is impossible to foretell what inferences may be drawn therefrom when further permit applications are made. As the application gathers momentum through the various stages of approval the likelihood of fresh, vigorous inquiry by the responsible bureaucracy to assure protection of the environment diminishes and becomes increasingly displaced by reliance upon what one official or another regards as "implicit" in the conceptual approval. Approving, as it does, matters of such pervasive importance as "the type of uses proposed . . . the size of the proposed project in terms of the maximum number of units to be permitted, the maximum square footage of commercial and office space, and the minimum acreage of open space," it may well be later construed to imply at least a partial weighing of statutory criteria, foreclosing thorough inquiry and giving direction to DEP's course of action when later applications are submitted. This is the thought expressed by the Office of Environmental Assessment in its memorandum of August 6, 1980, when it said

It is our opinion that a conceptual approval of the entire P.U.D. at this time may foreclose on the State's option to limit the extent and density of development in the subsequent phase applications. The ability to assess the actual impacts of this P.U.D. is impaired when one has to review it on such a gross scale. * * *

Therefore, it is our recommendation that the conceptual application of the Smithville P.U.D. be denied, with the understanding that each phase of the development may still be submitted and reviewed for compliance with all state regulations and policies and then limited to the appropriate human "carrying capacity" of this area. We do not feel that any approval should be granted which would conceptually give the applicant the right to establish a set population on this parcel of land until it can be definitively demonstrated that the population density and sites of construction are appropriate.

We also conclude that the permit approval cannot be sustained for the further reason that the DCR decision of September 8, 1980 is seriously deficient in essential findings. No explanation is offered, for example, as to why the agency approved a

development of such unusual density and intensity in an area which, by the Department's own regulation, contained "large environmentally sensitive areas" in which "only infill development is acceptable." *N.J.A.C.* 7:7E–6.7(b)4.iii. Although the decision gives recognition to the "intense pressure" for development of this low growth region "[d]ue to the high-growth projections for the Atlantic City/Atlantic County region which resulted from the passing of the Casino Referendum in November 1976," no reasons are given as to why the project could not be situated within Atlantic City or beyond its immediate environs rather than in this protected fragile environment. Such a finding would appear to be required by *N.J.S.A.* 13:19–7(g). This statutory provision mandates that the applicant's environmental impact statement include a statement of "[a]lternatives to all or any part of the project with reasons for their acceptability or nonacceptability." *See Public Interest Research Group v. State*, 152 *N.J.Super.* at 223. Moreover, *N.J.S.A.* 13:19–10 confines DEP's power to issue a permit to cases where enumerated, specific findings are made regarding the development's impact on the environment. Most of these findings were not and, as the Department itself conceded, could not be made for the reason that water quality impacts were unknown.

█ In our view, the fragility of the environment is so extreme, the consequences of miscalculation so great, and the legislative intent to preserve the environment so clearly stated, that we discern a strong statutory and regulatory presumption disfavoring a permit application for construction in regions with such sensitive characteristics without carefully documented findings as to the nonacceptability of all reasonable alternatives.

Finally, because necessary findings were not made, the Department's reliance on the large-scale plan residential rule is misplaced. This rule is contained in *N.J.A.C.* 7:7E–8.11. Prior to amendment in 1980 it read as follows:

7:7E-8.11 *Large scale planned residential development*

(a) Policy: Large scale, free-standing, planned residential developments, such as planned unit developments, shall be evaluated on a case-by-case basis to

determine the extent that the proposed development carries out the basic coastal policy to *concentrate the pattern of development,* contributes to regional housing needs, *and does not cause significant adverse secondary impacts.*

(b) Rationale: Large planned communities offer advantages of scale in creating new modes of development and providing housing. Such large projects may, however, detract from or alter appropriate regional patterns of development. [Emphasis supplied.]

The rule as amended in 1980 reads:

7:7E–7.2(1) *Large-Scale Residential Development*

1. *Definition*

Large-scale Residential Developments are free standing, planned developments, which include at least 500 residential dwelling units. They may also include commercial, industrial, and recreational uses.

2. *Policy*

Large-scale Residential Developments are conditionally acceptable, provided that they carry out the basic coastal policy to *concentrate the regional pattern of development,* contribute to regional housing needs, and *do not cause significant adverse secondary impacts.*

Large-scale Residential Developments need not meet the Land Area Policies, except in the High and Moderate Environmental Sensitivity portions of Limited Growth Regions, where only the roads and sewage criteria will be used in determining if the Development Potential is High, Medium or Low (See Policy 7:7E–5.5(b)).

3. *Rationale*

Large planned communities offer advantages of scale in creating new modes of development and providing housing. Such large projects may, however, detract from or alter appropriate regional patterns of development. [Emphasis supplied]

Under either the original regulation or in its form as amended in 1980, the rule was inapplicable absent findings that the large-scale development carried out basic coastal policy to concentrate the pattern of development and would not cause significant adverse secondary impacts. We find no such findings to have been made. Apart therefrom, even if the large-scale development rule were invocable, since the developer will be selling parcels of land to outside builders for subdevelopment, there is no assurance that the proposed development in its full postulated magnitude and claimed balance will ever come to fruition or that its anticipated benefits, which are visualized as justification for the threatened environmental harm, will actually be realized. Moreover, we find no assurance that the appli-

cant will be required to give security for completion of the project and to cure harmful impacts to the environment that may later result. Indeed, it may well be that the applicant will be out of existence or otherwise not answerable for redress when the injurious consequences are discovered.

Reversed.