RICHARD CREMA, DONALD MAXWELL, THE SOUTH JERSEY SHELLFISHERMAN'S ASSOCIATION, THE AMERICAN LITTORAL SOCIETY, AND THE SIERRA CLUB, NEW JERSEY CHAPTER, RESPONDENTS, v. NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, AND THE COASTAL AREA REVIEW BOARD, APPELLANTS, AND THE HISTORIC SMITHVILLE DEVELOPMENT COMPANY, A NEW JERSEY GENERAL PARTNERSHIP, INTERVENOR-APPELLANT.

Argued February 8, 1983—Decided August 1, 1983.

*John M. Van Dalen,* Deputy Attorney General, argued the cause for appellants (*Irwin I. Kimmelman,* Attorney General of

New Jersey, attorney; *James J. Ciancia,* Assistant Attorney General, of counsel).

*Michael J. Gross* argued the cause for intervenor-appellant (*Giordano, Halleran & Crahay,* attorneys; *James L. Cooper,* of counsel; *Lewis S. Kurland,* on the brief).

*Nathan M. Edelstein* argued the cause for respondents (*Brener, Wallack & Hill,* attorneys).

The opinion of the Court was delivered by

HANDLER, J.

Historic Smithville Development Corporation (HSDC) sought to construct a large scale residential and commercial development in an environmentally sensitive area governed by the Coastal Area Facility Review Act, *N.J.S.A.* 13:19–1 to –21 (CAFRA). It applied to the New Jersey State Department of Environmental Protection (Department or DEP) for a permit authorizing the development. DEP ultimately granted a permit approving only the "concept" of the development. The permit did not authorize or allow any actual construction until all prescribed statutory and regulatory standards were met.

DEP's action was successfully challenged in the Appellate Division by commercial shell fishermen and several nonprofit entities concerned with the preservation of the environment and protection of the shell fishing industry (referred to here as "objectors"). The Appellate Division ruled that "conceptual approval" of the proposed development was not authorized by either CAFRA or any of the Department's regulations. 182 *N.J.Super.* 445 (App.Div.1982). It found that the indefinite nature of the approval further evidenced the lack of express or implied statutory authority. *Id.* at 451–52. The court concluded that the determination to approve the "concept" of the proposed development was deficient in essential findings of fact and, further, in the absence of necessary findings, the application for a permit could not be sustained under a special departmental rule relating specifically to large scale, planned residential de-

velopments. *Id.* at 452–53. The Department of Environmental Protection and the Coastal Area Review Board (referred to here as "agencies") successfully petitioned this Court for certification. 91 *N.J.* 243 (1982). With certain modifications as set forth in this opinion, we now affirm the judgment of the Appellate Division.

I

The procedural history of this litigation must be presented in detail in order to understand fully the issues that are raised on appeal. On October 9, 1979 Historic Smithville Development Corporation applied to the DEP's Division of Coastal Resources (Division or DCR) for permits under the Coastal Area Facility Review Act. The application proposed a large-scale residential and commercial development in an area referred to as the Mullica-Southern Ocean region in the vicinity of the Great Bay-Mullica River estuary. This area is governed by CAFRA and is designated under regulations promulgated by the Department (*N.J.A.C.* 7:7E–5.7(b)(3)) as an environmentally sensitive limited growth region, generally allowing only infill development. The site is upstream from the Brigantine National Wildlife Refuge which is dedicated to the protection of wildlife and wetlands. It is situated over an aquifer and contains several water courses that form the estuary which is one of the last remaining commercially successful shell fishing areas in this part of the State. The proposal contemplated a 700-room hotel, 6,850 living units, 860,000 square feet of commercial and office space and a population of 20,000 people. Within 15 miles of Atlantic City and near several major highways, including the Garden State Parkway, the site is considered a premier location for development.

The submission of this application followed extended discussions between the Division and HSDC.[1] In the course of these discussions the Division decided that upon submission of a completed application "the project would be reviewed conceptually to determine whether growth at this scale could occur in this area without presenting adverse impacts to the environmentally sensitive features which led to the classification of the area's 'Land areas' as a 'low growth' region . . . ."[2]

The DCR conducted a public hearing on the application on April 2, 1980. Opposition concerning the likely adverse environmental impacts of the project was expressed by the objectors and by several state and federal agencies, including the Division of Water Resources, the Bureau of Shellfish Control, the Office of Environmental Assessment, the Division of Fish, Game, and Wildlife, the United States Fish and Wildlife Service, and the United States Environmental Protection Agency. On September 8, 1980 the DCR in a written opinion conditionally approved the concept of HSDC's large-scale development and conditionally granted a CAFRA permit. However, HSDC was not authorized to commence any construction until it received additional permits. The Division described its action in these terms:

> This approval is conceptual. It does not give the applicant the right to commence site clearing, preparation, or any other construction activities related to the project beyond the work on the model units released by letter of June 13, 1980 from Director Kinsey.[3] Every parcel of the project will require a complete submission under CAFRA as defined in the CAFRA *Procedural Rules*

---

[1]Discussions between the applicant and the DCR began in January 1978. HSDC's CAFRA permit application which was filed on October 9, 1979 was incomplete. After additional submissions, the DCR declared the application "complete for filing" on February 8, 1980.

[2]The DCR's decision regarding this procedure is mentioned only in its September 1980 opinion approving HSDC's CAFRA permit. The decision to proceed in this way was not previously announced nor did it result from any independent proceeding in which a record was made.

[3]On June 13, 1980, DCR permitted the construction of 23 units of model homes.

*and Regulations,* (N.J.A.C. 7:7D–2 *et seq.*), with a normal application review process including the required fact-finding public hearing.

This approval, however, encompasses the ·concept of the development of a Large Scale Planned Residential Development in the proposed location of the portion of Galloway Township which has a "limited growth region" designation in the Land Area Location policies. Generally, the approval extends to the type of uses proposed and to the size of the proposed project in terms of the maximum number of units to be permitted, the maximum square footage of commercial and office space, and the minimum acreage of open space. In addition, this approval includes support of the general stormwater management plan, water supply plan, and wildlife/vegetation maintenance plan and controls.

The approval does not obligate any Department or Agency of the State of New Jersey to approve any parcel or component of the proposed development nor does it imply DEP approval under CAFRA of any subsequent submission for a construction permit application. The groundwater, surface water, traffic and air quality monitoring programs and data reporting specified as conditions to this approval shall be carried out as outlined, for the time periods specified. At some future date, if adverse effects develop which cannot be corrected, the size of the development will have to be restricted below that proposed in the Master Development Plan that is being granted a "conceptual" approval by this CAFRA permit decision. In addition, remedial measures may be required if significant adverse effects develop.[4]

Objectors promptly appealed to the Commissioner of the Department of Environmental Protection, challenging the issuance of a CAFRA permit based on a conceptual approval. On December 15, 1980 the Department denied objector's request for a plenary hearing on the CAFRA permit, finding that they failed to challenge specific facts or conclusions of law and that the issues raised related to policy matters. The Department referred the appeal to the Coastal Area Review Board (CARB) for its review pursuant to *N.J.S.A.* 13:19–13 and *N.J.A.C.* 7:7D–1 *et seq.*

---

[4]While its application was pending, HSDC had requested that the result of a favorable review of the "concept" of the development be expanded to imply final approval for the whole project, with the condition that a site plan for each development component be submitted to DCR for a 30-day review and approval. However, DCR, according to its written decision, denied the request on the ground that any such final approval of the pending application under CAFRA could not have met the public notice and participation requirements of the Act because of the complexity and scale of the project and the nature of the anticipated development process.

CARB conducted public hearings on January 9, February 9 and 20, and March 6, 1981. At its February 20 hearing, CARB concluded that DCR was the proper agency within DEP to review the HSDC application. However, it referred the questions of the statutory and regulatory authority of the agency to engage in conceptual review of a proposed project to the Office of the Attorney General for legal advice.[5]

At its March 6 hearing, apparently armed with the Attorney General's advice,[6] CARB voted unanimously that DCR had both the statutory and regulatory authority to engage in conceptual review, subject to three conditions. These were: (1) that there must be a plan for continuing public review to assure compliance with the permit conditions; (2) that subsequent construction approvals be measured against the regulatory standards prevailing at the time of those approvals; and (3) that DCR, in the future, be "extremely judicious" in granting conceptual approval because of the danger that it be used as a bar to the deliberation of relevant issues in subsequent permit proceedings. CARB affirmed DEP's conceptual approval of HSDC's project, with the admonition that conceptual approval not be used as

---

[5]CARB denied objectors' request for a stay of the conceptual approval permit because the request was not made within 21 days of the decision of the Commissioner on the permit, see N.J.A.C. 7:7D–1.9, even though objectors requested the stay at the beginning of January, immediately upon counsel being retained. CARB also refused to permit objectors to present evidence that the administrative record did not factually support conceptual approval of HSDC's proposed development in light of the CAFRA statute and the location, use and resource policy regulations.

[6]The Office of the Attorney General rendered its advice orally before the March 6 hearing and reduced it to writing on April 3, 1981. It advised CARB that DEP's "power to issue approval for the concept of a large scale project can be readily implied from the explicit grant of power to issue construction permits. The [former] is merely a lesser included part of the [latter]." However, the Attorney General's office cautioned that conceptual approval of the HSDC project, as awarded by DCR, is conditioned upon the satisfaction of the substantive statutory environmental criteria governing approval that are in effect at the time such construction permits are reviewed.

"some sort of club" to cut off debate on all factual issues in subsequent permit proceedings.[7]

The objectors appealed the CARB decision to the Appellate Division. Several months later, on July 24, 1981, CARB issued a written opinion titled *In The Matter of Historic Smithville Development Corporation,* confirming its oral affirmance of the DCR decision.[8] On January 20, 1982 the Appellate Division reversed the CARB decision on the conceptual approval permit. 182 *N.J.Super.* 445.[9]

---

[7]While HSDC's application for conceptual approval was under DCR consideration during the summer of 1980, HSDC submitted additional permit applications for the actual construction of Phase 1A and Phase 1B of the project. DCR issued the Phase 1A permit (672 dwellings) on January 27, 1981. Objectors requested a hearing in connection with the Phase 1A permit and a stay of the construction until the final determination of their conceptual approval appeal. DEP did not respond to the request until after CARB completed its review of the conceptual approval determination. Following CARB's oral affirmance of that conceptual approval, DEP, on March 17, 1981, granted objectors' January 27 request for a hearing on the Phase 1A permit, referring the matter to the Office of Administrative Law. However, DEP denied a stay in light of CARB's March 6, 1981 decision affirming HSDC's conceptual approval. Objectors proceeded with the Phase 1A hearing before the administrative law judge but then discontinued the proceeding and their appeal was dismissed with prejudice on August 18, 1981. DEP affirmed the dismissal on October 22, 1981. The Phase 1B construction permit was issued on November 2, 1981 but objectors sought no further administrative review of this permit.

[8]When objectors appealed the CARB decision to the Appellate Division they again sought a stay of Phase 1A construction. *Supra* at 294 n. 7. Objectors asserted that DCR's conceptual approval, affirmed by CARB, permanently foreclosed review of substantive issues, such as the location, intensity, and size of the project. Although the Appellate Division denied the stay, it cautioned HSDC to proceed at its own risk and construction apparently commenced at that time.

[9]On the day of the Appellate Division decision on the conceptual approval, objectors requested that the Department issue no further permits to HSDC and rescind the permits for Phase 1A and 1B. The DEP replied that Phase 1A and Phase 1B permits "stand on their own" and denied the request. Objectors repeated their demand in a letter dated February 2, 1982, but the DEP again denied the request. On February 24, 1982, the objectors filed a motion in the Appellate Division requesting supplementary relief in the form of an order directing the DEP to reevaluate the Phase 1A and Phase 1B permits in

## II

The fundamental issue in this appeal is the validity of a conditional CAFRA permit that approves the concept of a proposed large scale development. Specifically included within this broad issue are the questions of whether the conceptual approval of such a project is authorized either by the statute or implementing regulations and whether the administrative proceedings that resulted in the issuance of the permit approving the concept of the proposed development were valid. We examine initially the nature of the statutory and regulatory authority to issue such a permit.

The Coastal Area Facilities Review Act, *N.J.S.A.* 13:19–1 to –21, governs all development in the environmentally sensitive coastal lands covered by the Act. *N.J.S.A.* 13:19–5 provides that "[n]o person shall construct or cause to be constructed any facility in the coastal area until a permit has been issued by the [C]ommissoner" of DEP. A "facility" is broadly defined to include almost all land uses. *N.J.S.A.* 13:19–3(c). Any person proposing to construct or cause to be constructed a facility in the coastal area must file an application, including an environmental impact statement, with the Commissioner of DEP. *N.J.S.A.* 13:19–6, –7. After the application is declared complete, *see N.J.S.A.* 13:19–8, DEP must hold a hearing to afford interested parties the opportunity to comment. *N.J.S.A.* 13:19–9. Appeals from DEP permit decisions may be taken to the Coastal Area

---

light of the January 20, 1982 decision and to revoke, rescind or suspend the Phase 1A and 1B permits pending such evaluation. The Appellate Division denied the requested relief on jurisdictional grounds. Objectors then filed a motion for leave to appeal for supplementary relief with this Court on March 19, 1982, which motion was denied. They also instituted a separate appeal, which is now pending in the Appellate Division, for review of the Phase 1A and Phase 1B permits. In addition, appellants sought interlocutory relief in the Phase 1A and Phase 1B appeal in both the Appellate Division and this Court. Both courts denied the applications as well as objectors' additional motion to supplement the record in this case.

Review Board (CARB).[10]  The only "permit" which DEP may issue is that provided under *N.J.S.A.* 13:19–5 for the construction of a project.   *N.J.A.C.* 7:7D–2.2 defines "[p]ermit" as "any legal instrument, constituting permission to construct a facility in the coastal area, that is issued by the commissioner pursuant to *N.J.S.A.* 13:19–1 *et seq.*"

■ The statute does not contain any explicit statutory authorization for the conceptual approval of a proposed facility.  The departmental regulations implementing CAFRA are similarly silent.  The regulations do authorize the issuance of construction permits with conditions but such permits are nonetheless construction permits.  Under the regulations a "permit condition" is "a requirement of the permit ... applicable during, and after construction."  *N.J.A.C.* 7:7D–2.2.  We cannot construe the permit issued in this case to be such a conditional permit.  As noted by the Appellate Division, the permit issued by DEP in these proceedings approved of the concept of the development, but did not authorize its construction.  182 *N.J.Super.* at 452.

In claiming that the conceptual approval issued in this case should be recognized as a "conditional permit," DEP and CARB rely on *Public Interest Research Group v. State,* 152 *N.J.Super.* 191 (App.Div.1977), certif. den., 75 *N.J.* 538 (1977).  There, the Appellate Division sustained a permit to construct a nuclear

---

[10]The Coastal Area Review Board is composed of three voting members, one each to be designated by the Commissioner of DEP, the Commissioner of Labor and Industry, and the Commissioner of Community Affairs.  *N.J.S.A.* 13:19–13.  CARB has the power to review the decision of the Commissioner of DEP with respect to the applicability of CAFRA to a proposed use.  Several other provisions of CAFRA are also relevant to this case.  The statute provides that the denial of a permit application shall in no way adversely affect the future submission of a new application.  *N.J.S.A.* 13:19–15.  The DEP is "authorized to adopt, amend and appeal rules and regulations to effectuate the purposes of [CAFRA]."  *N.J.S.A.* 13:19–17.  Lastly, the Act shall not be construed to impair the municipal zoning authority.  *N.J.S.A.* 13:19–19.  The Act is to be "liberally construed to effectuate the purpose and intent thereof."  *N.J.S.A.* 13:19–20.  Violations of the Act may give rise to injunctive relief and monetary sanctions.  *N.J.S.A.* 13:19–18.

reactor facility subject to the condition that specific additional criteria be satisfied before the commencement of actual construction. We agree with the Appellate Division's determination below that *Public Interest Research Group, supra,* is distinguishable because the record of that case contained evidence sufficient to sustain DEP's determination that the statutory criteria for construction of the project had been "basically satisfied." 182 *N.J.Super.* at 451. In this case, the evidence was insufficient to support the necessary findings required under *N.J.S.A.* 13:19–10 and –11 for the issuance, or conditional issuance, of any construction permit. In fact, the permit in this case purported to postpone an applicant's satisfaction of the necessary findings on the "legislated requirements [until] some later time." 182 *N.J.Super.* at 452.

The regulations also offer a prospective applicant the option of an informal review in the form of a pre-application conference, which consists of the agency's candid but non-binding discussion and evaluation of the proposed application. *See N.J.A.C.* 7:7D–2.3(c)(1). This mechanism enables the agency to advise a potential applicant whether a proposed facility is likely to receive favorable agency action, without subjecting the proposal to the rigors of the CAFRA requirements. The conceptual review and approval in this case also cannot be considered to be an informal pre-application conference envisioned by this regulation. The process undertaken was neither informal nor non-binding. The evaluation of the application entailed public notice, public hearings and agency adjudication, all of which greatly exceed the loose procedural framework and minimal standards under *N.J.A.C.* 7:7D–2.3(c). *Compare N.J.A.C.* 7:7D–2.-3(d) (formal application procedure for permit). Further, DEP treated the application as a formal permit. Its approval, while granting no construction rights, created other rights and binding obligations, notwithstanding the uncertainty and controversy concerning the legal effect of the approval. Again, this facet of the permit differs markedly from the departmental discussions

and evaluation contemplated by the regulations governing informal review.

■ We conclude that the permit granted by DEP in this case in the form of a conceptual approval of HSDC's proposed residential and commercial development was not authorized by either the express provisions of CAFRA or any standards found in current departmental regulations implementing CAFRA. On these grounds therefore the approval cannot be sustained.

### III

Notwithstanding the lack of express provisions authorizing the issuance of a "conceptual approval," the Attorney General argues that the authority to issue such a permit can be reasonably implied and that entitlement to such approval can be determined through administrative adjudication without the prior adoption of formal rules or regulations defining such authority. Objectors disagree, as did the Appellate Division, with the premise that a conceptual approval authority can be reasonably implied in CAFRA. They also contend that, even were there an implied power to authorize the conceptual approval of a proposed project, the authority and procedure therefor must be effectuated through a proper exercise of the agency's rule-making powers, and not through *ad hoc* adjudication.

■ The basic difficulty in addressing whether the agencies possess the implied power under CAFRA to issue a conceptual approval inheres in the lack of a clear understanding or settled definition of such an approval. It would appear that the putative conceptual approval power is one that would fall somewhere between a binding construction permit with or without conditions and the non-binding conference review and evaluation. Such an implied power, theoretically, could be viewed broadly as generally analogous to provisions of the Municipal Land Use Law, *N.J.S.A.* 40:55D-1 to -99, which grant similar kinds of land use authority to local municipalities. *Cf. N.J.S.A.* 40:55D-49 (preliminary approval); *N.J.S.A.* 40:55D-10.1 (informal re-

view of concept plan). CAFRA is a comprehensive legislative scheme that encompasses land use regulation with respect to which the existence of such authority can reasonably be implied. *E.g., In re Egg Harbor Associates,* 94 *N.J.* 358 (1983). The subsidiary question, then, is whether establishment of an implied conceptual approval authority and the establishment of that authority should be undertaken through administrative rule-making or adjudication.

■ It is generally acknowledged that an agency may make law through either its adjudicatory or rulemaking power. "Administrative agencies enjoy a great deal of flexibility in selecting the proceedings most suitable to achieving their regulatory aims." *Bally Mfg. Corp. v. New Jersey Casino Control Comm'n,* 85 *N.J.* 325, 338 (1982) (Handler, J., concurring); *see Securities and Exchange Commission v. Chenery Corp.,* 332 *U.S.* 194, 202–03, 67 *S.Ct.* 1575, 1580, 91 *L.Ed.* 1995, 2002 (1947) (*Chenery II*). *See also In re Uniform Administrative Procedural Rules,* 90 *N.J.* 85, 92 (1982). A high degree of discretion in exercising that choice reposes in the administrative agency, *N.J.S.A.* 52:14F–7; *N.J.A.C.* 1:1–2.2(a).

■ Nevertheless, the discretion in the administrative choice between rulemaking and adjudication has limits. *See N.J.S.A.* 52:14B–2(b), (c), (e). This Court has recognized the need and efficacy of rulemaking for establishing administrative law, *see, e.g., General Assembly of State of New Jersey v. Byrne,* 90 *N.J.* 376, 385 (1982); *R.H. Macy & Co., Inc. v. Director, Division of Taxation,* 41 *N.J.* 3, 4 (1963). When the agency is concerned with "broad policy issues" that affect the public-at-large or an entire field of endeavor or important areas of social concern, or the contemplated action is intended to have wide application and prospective effect, rulemaking becomes the suitable mode of proceeding. *Bally Mfg. Corp., supra,* 85 *N.J.* at 340–41 (Handler, J., concurring); *Bally Mfg. Corp., supra,* 85 *N.J.* at 333; *Boller Beverages, Inc. v. Davis,* 38 *N.J.* 138, 155 (1962) ("When an administrative agent is given full rule-making power, he

must in all fairness, bottom an alleged violation on general legislation before he may rule in a particular case. The general mandate, either statutory or administrative, must precede the specific violation."). *See, e.g., N.L.R.B. v. Wyman-Gordon Co.,* 394 *U.S.* 759, 777, 89 *S.Ct.* 1426, 1435, 22 *L.Ed.2d* 709, 721 (1969) (Douglas, J., dissenting); *N.L.R.B. v. Bell Aerospace, Co.,* 416 *U.S.* 267, 294, 94 *S.Ct.* 1757, 1771, 40 *L.Ed.2d* 134, 154 (1974) ("[T]here may be situations where the Board's reliance on adjudication would amount to an abuse of discretion or a violation of the Act."); *see also Bally Mfg. Corp., supra,* 85 *N.J.* at 341–43 (Handler, J., concurring) (recognizing procedures for "specific rulemaking"; rulemaking may be appropriate even when proposed rule has special impact upon particular parties as well as the public); *cf. Cunningham v. Department of Civil Service,* 69 *N.J.* 13, 24 (1975) (providing right to a hearing in a case involving an individual special interest or property right with seemingly contested adjudicative factual issues). *See generally,* Shapiro, *The Choice Of Rulemaking Or Adjudication In The Development Of Administrative Policy,* 78 *Harv.L.Rev.* 921, 929–42 (1965); Robinson, *The Making Of Administrative Policy: Another Look At Rulemaking And Adjudication And Administrative Procedure Reform,* 118 *U.Pa.L.Rev.* 485, 513–28 (1970); Mayton, *The Legislative Resolution Of The Rulemaking Versus Adjudication Problem In Agency Lawmaking,* 1980 *Duke L.J.* 103 (1980).[11]

---

[11]Establishing administrative policy by adjudication may suffer from at least three defects. First, parties to the adjudication may not have had fair notice or a reasonable opportunity to anticipate and prepare to address the policies that will govern the proceedings. Second, persons who are not parties to the adjudication may have substantial interests at stake that can be affected by the adjudication but that are not adequately expressed or presented by the actual parties or fully considered by the agency. Third, establishing administrative policy by adjudication may force the parties to bear a disproportionate share of the cost of resolving issues of general applicability. 2 K.C. Davis, *Administrative Law Treatise,* § 7:25 at 186 (2d ed. Supp.1982) (noting that the combination of several elements including the degree of undesirability of changing law through adjudication, the potential unfairness

In this case the Department in effectuating CAFRA policy has itself recognized the importance of proceeding with the utmost care, caution and clarity in exercising its decisional and regulatory responsibilities. It has disciplined its own discretion by promulgating a regulation to assure the greatest possible degree of "predictability" in its own actions. *N.J.A.C.* 7:7E–1.1. This is salutary. "[A]dministrative officers [should] articulate the standards and principles that govern their discretionary decisions in as much detail as possible." *Environmental Defense Fund, Inc. v. Ruckelshaus,* 439 *F.*2d 584, 598 (D.C.Cir.1971). *See Ford Motor Co. v. Federal Trade Commission,* 673 *F.*2d 1008, 1009 (9 Cir.1981), *cert.* den., —— *U.S.* ——, 103 *S.Ct.* 358, 74 *L.Ed.*2d 394 (1982) (finding that an agency determination that changes existing law and has widespread application must be addressed by rulemaking and not adjudication). It was recently observed:

" '[D]ue process means that administrators must do what they can to structure and confine their discretionary powers through safeguards, standards, principles and rules.' *City of Santa Clara v. Kleppe,* 418 *F.Supp.* 1243, 1261 (N.D.Cal. 1976), *aff'd in part and rev'd in part on other grounds sub nom. City of Santa Clara v. Andrus,* 572 F.2d 660 (9th Cir.), *cert. denied* 439 U.S. 859, 99 S.Ct. 177, 58 L.Ed.2d 167 (1978). This principle employs no balancing approach but simply holds that due process requires some standards, both substantive and procedural, to control agency discretion. *See* K. Davis, [*Administrative Law Treatise,* § 7:26 (2d ed. 1979) ]." [*Historic Green Springs, Inc. v. Bergland,* 497 F.Supp. 839, 854 (E.D.Va.1980) ]

■ The subject matter of the agency proceedings involved in this case dictates that the "function of filling in the interstices of the [statutory legislation] should be performed . . . through th[e] quasi-legislative promulgation of rules to be applied in the future." *Chenery II, supra,* 332 *U.S.* at 202, 67 *S.Ct.* at 1580, 91 *L.Ed.* at 2002. The principle of conceptual approval, both as a decision rendered in this case and as a regulatory precedent, has a prospective and public impact that transcends the immediate

to nonparties who are denied opportunity to influence lawmaking that drastically affects them, and the unexpectedness of the change in law should compel an agency to use rulemaking procedure).

interests of the actual parties whose rights were purportedly adjudicated in these proceedings. The special importance that attaches to the public interests such as health and the quality of life that are implicated by the agency's adjudication in this case cannot be overemphasized. *See In re Egg Harbor Associates, supra,* 94 *N.J.* 358 at 374 (Schreiber, J., dissenting); *Environmental Defense Fund, Inc. v. Ruckelshaus, supra.* The effect of a conceptual approval is exemplified in this case. The agency has seemingly determined "the type of uses proposed * * * the size of the proposed project in terms of maximum number of units to be permitted, the maximum square footage of commercial office space and the minimum acreage of open space." *Ante* at 292. This determination will effectively imprint a considerable amount of environmentally sensitive and unique coastal land, with continuing widespread effects upon the public at large for the indefinite future.

Further, the actions taken by DEP that resulted in the issuance of a "conceptual approval" could not have been fairly anticipated or addressed by the interested public since that authority was not specifically provided by the statute or any regulation prior to its exercise in this case. Additionally, there were no substantive criteria established before the administrative proceedings for determining how to qualify for a "conceptual approval." Thus, the public and any affected or interested parties were without any firm knowledge of the factors that the agency would deem relevant and that might influence its ultimate decision. The public had no meaningful opportunity to shape the criteria that ultimately affected their interests. *See Historic Green Springs, Inc. v. Bergland, supra; Environmental Defense Fund, Inc. v. Ruckelshaus, supra. See generally* Mayton, *The Legislative Resolution Of The Rulemaking Versus Adjudication Problems In Agency Lawmaking, supra.*[12]

---

[12]In this case we consider it insufficient for the agency to give notice of its proposed action at the time of the public hearing. Such notice fails to forewarn the actual participants or other interested members of the public,

Finally, the absence of established standards has contributed materially to a confusing result. The public impact, indeed, may be unfathomable. As observed by the Appellate Division, the conceptual approval given in this case "is of so indefinite a nature that it is impossible to foretell what inferences may be drawn therefrom when further applications are made." 182 *N.J.Super.* at 452.

█ We therefore conclude that DEP's "reliance on adjudication . . . amount[ed] to an abuse of discretion or a violation" of the Coastal Area Facility Review Act. *Bell Aerospace, supra,* 416 *U.S.* at 294, 94 *S.Ct.* at 1771, 40 *L.Ed.2d* at 154. We recognize that the authority to engage in the conceptual review and approval of proposed developments subject to CAFRA is a power that can reasonably be implied in light of the operative Act. We specifically hold that the conceptual review and approval of proposed developments, to the extent the exercise of this authority purports to establish enforceable rights beyond those now provided by the informal review regulations, require advance promulgation of regulatory standards, both substantive and procedural. These standards should be determined by agency rulemaking in order that the criteria that underlie their formulation and application can be properly developed and expounded with the maximum involvement of the general public. The absence of such regulations is fatal to the agency actions undertaken in these proceedings. Accordingly, on these grounds the conceptual approval must be considered invalid.

---

and leaves unresolved until the moment of decision the question of which substantive standards and policy principles will be applied. Consequently, the timing and content of such notice will not redress the inability of the public to participate in the formulation of those standards and policies. *See Historic Green Springs, Inc. v. Bergland,* 497 *F.Supp.* 839, 854 (E.D.Va.1980) ("[W]ithout published rules of procedure and substantive criteria for [the taking of the proposed action, affected parties] have been denied any meaningful opportunity for informal response to the proposed action."); *see also Boller Beverages, Inc. v. Davis,* 38 *N.J.* 138, 151–52 (1962).

IV

█ The Attorney General asserts that 1978 coastal policy regulations governing large-scale planned residential developments (LSPRD), *N.J.A.C.* 7:7E–8.11(a) (recodified in 1980 at *N.J.A.C.* 7:7E–7.2(i)), support the agency's use of the conceptual review and approval process. *N.J.A.C.* 7:7E–8.11(a) provided that such developments "shall be evaluated on a case-by-case basis to determine the extent that the proposed development carries out . . . basic coastal policy . . ."[13] He claims that the LSPRD rule gives the agency discretion to carry out its objectives by permitting a case-by-case determination of the location of such projects in low growth regions. He maintains that DCR's conceptual approval was valid because HSDC's project would concentrate development, provide urgently needed low and moderate income housing, and would not cause significant adverse secondary impacts. *See N.J.A.C.* 7:7E–7.2(i).

CAFRA explicitly recognizes the importance of protecting environmental concerns while encouraging compatible economic growth and development. *N.J.S.A.* 13:19–2. *See In re Egg Harbor Associates, supra.* To further the legislative purpose, the statute itself mandates that DEP select an "environmental design" that "shall be the approved management strategy for the coastal area." *N.J.S.A.* 13:19–16. Accordingly, the DEP established regulations adopting a set of "location," "use" and "resource" policies "as administrative rules, according to the Administrative Procedures Act, [in order] to increase the predictability of the Department's coastal decision-making by limiting administrative discretion." *N.J.A.C.* 7:7E–1.1

Although both versions of the LSPRD rule suggest agency flexibility, no such development can be authorized unless it "carr[ies] out the basic coastal policy to concentrate the regional

---

[13]The language of *N.J.A.C.* 7:7E–7.2(i) differs slightly from that of its predecessor *N.J.A.C.* 7:7E–8.11(a). The former provides that "Large-scale Residential Developments are conditionally acceptable, provided they carry out . . . basic coastal policy . . . ."

pattern of development, contribute to regional housing needs, and do[es] not cause significant adverse secondary impacts." *N.J.A.C.* 7:7E–7.2(i); *see also N.J.A.C.* 7:7E–8.11(a) (1978 version). Moreover, although the rule permits certain other enumerated substantive criteria to be bypassed, neither version suggests that procedural regulations authorizing construction permits or permitting informal, non-binding conferences can be ignored when the agency reviews construction permit applications under the LSPRD regulation.

The DCR conclusion that HSDC's project "will clearly result in the addition of a new growth center within the region" is not legally sufficient to meet the regulatory standard embodied in the LSPRD rule. Its interpretation of the regulation's term of "concentration" to mean the population density of a development, rather than concentration of location within the region, fails to address objectors' assertion that the establishment of a new growth center itself frustrates the goal of the LSPRD rule.

On the issue of secondary impacts, objectors recite a series of location, use and resource policies that they contend were inadequately addressed by the agency. In this case, as noted, the site of the proposed development lies in the Mullica-Southern Ocean region of the coastal area, a location for which an especially important "concern is conservation of the natural environment." *N.J.A.C.* 7:7E–5.7(b)(3).[14] The policy concerns, such as the marine effect of water runoff and resort development, were so inadequately or generally treated that the agency could not validly apply its LSPRD rule to issue conceptual approval. We agree with the Appellate Division, which determined that the absence of essential findings on secondary impacts and the

---

[14]Amendments to *N.J.A.C.* 7:7E–5.3 and –5.7, enacted after the DEP decision, *see* 14 *N.J.R.* 1130 (October 18, 1982) now explicitly provide that LSPRDs may be constructed in low growth regions. They explicate the basic policies embodied in *N.J.A.C.* 7:7E–1.1 and –7.2, but offer no guidance on the types of procedures to be used to approve LSPRDs.

possibility of piecemeal development foreclose application of the LSPRD regulation. 182 *N.J.Super.* at 454.

In light of our determination that deficiencies in the factual findings precluded the application of the LSPRD rule, we need not reach the question whether the agency's decision to invoke the LSPRD rule was invalid on other grounds.[15]

## V

We conclude that the conceptual review and approval of the proposed project undertaken by the agencies in this case were not expressly authorized by the statutory provisions or regulations governing developments in the coastal areas of the State under CAFRA. We also find that such agency action could not properly be taken in the absence of validly adopted rules and regulations establishing appropriate standards and procedures governing such approvals. Further, the record is factually insufficient to sustain the agency action separately under the departmental rules governing certain large scale developments.

Accordingly, as modified herein, the judgment below is affirmed.

*For affirmance as modified*—Chief Justice WILENTZ and Justices CLIFFORD, SCHREIBER, HANDLER, POLLOCK and GARIBALDI—6.

*For reversal*—None.

---

[15]The objectors maintain that DEP erred in its decision to apply the LSPRD rule and grant conceptual approval, thereby overriding certain other substantive location policies, including the agency's coastal location acceptability method (CLAM analysis). We note that the Attorney General expressed this position to the agency, cautioning against disregarding the CLAM analysis, and suggesting redesignation of the Mullica-South Ocean region through rulemaking as a possible solution. *See ante* at 304 n. 13.