955 A.2d 976 (2008)
402 N.J. Super. 607
In the Matter of the PROPOSED XANADU REDEVELOPMENT PROJECT and the Approval of the Joint Hearing Officers' Report by the New Jersey Meadowlands Commission and the New Jersey Department of Environmental Protection Pursuant to N.J.S.A. 5:10-23 and of the Section 5(X) Consultation Report by the New Jersey Meadowlands Commission Pursuant to N.J.S.A. 5:10-5(x) with Respect to the Proposed Project.
Nos. A-0674-04T1, A-0688-04T1.
Superior Court of New Jersey, Appellate Division.
Argued January 30, 2008.
Decided September 17, 2008.
*981 D. Mark Leonard argued the cause for appellant Hartz Mountain Industries, Inc., in A-0674-04T1 (Horowitz, Rubino & Patton and Walder, Hayden & Brogan, attorneys; Irwin A. Horowitz, Justin P. Walder, and Allen J. Magrini, of counsel; Mr. Leonard, Shalom D. Stone, and Asaad K. Siddiqi, Roseland, on the brief).
Edward Lloyd, New York, NY, argued the cause for appellants The Sierra Club and others in A-0688-04T1 (Morningside Heights Legal Services, Inc., Environmental Law Clinic, Columbia School of Law, attorneys; Mr. Lloyd, on the brief).
Christine Piatek, Deputy Attorney General, argued the cause for respondent Department of Environmental Protection (Anne Milgram, Attorney General, attorney; Michael J. Haas, Assistant Attorney General, of counsel; Ms. Piatek, on the brief).
Timothy J. O'Neill argued the cause for respondent New Jersey Sports & Exposition Authority (Windels Marx Lane & Mittendorf, attorneys; Mr. O'Neill, of counsel; Charles M. Fisher, Ellen M. Christoffersen, and Lisa D. Cornacchia, Princeton, on the brief).
Michael R. Cole argued the cause for respondents The Mills Corporation and Mack-Cali Realty Corporation (DeCotiis, FitzPatrick, Cole & Wisler, attorneys; Mr. Cole, of counsel; Benjamin Clarke, Gregory J. Bevelock, and Alice M. Penna, Teaneck, on the brief).
Before Judges WEFING, PARKER and LYONS.
The opinion of the court was delivered by
LYONS, J.A.D.
This case concerns the New Jersey Sports and Exposition Authority's (NJSEA) proposed Xanadu Redevelopment Project (Xanadu), a massive multi-use development, to be constructed and operated in and around what is now known as the IZOD Center site in the Hackensack Meadowlands.[1] The Sierra Club, Environmental Defense, the New Jersey Public Interest Research Group Citizen Lobby, Inc., and the New Jersey Environmental Federation (collectively Sierra), and Hartz Mountain Industries, Inc. (Hartz) appeal from Resolution Number 04-60 of the New Jersey Meadowlands Commission (NJMC) adopting the consultation report and hearing officers' report for the proposed Meadowlands Xanadu Redevelopment Project, and the October 1, 2004, order of Commissioner Bradley M. Campbell (Campbell) of the New Jersey Department of Environmental Protection (NJDEP), adopting and revising the hearing officers' report and recommendations regarding the proposed Xanadu Redevelopment Project. Because we find both NJMC and NJDEP fulfilled their statutory mandate to consult with NJSEA concerning the Xanadu Redevelopment Project, we affirm.

I. FACTS AND PROCEDURAL HISTORY

Before addressing the arguments of Hartz and Sierra on appeal, it is necessary *982 to set forth some of the pertinent facts and procedural history related to this matter. In 1971, the Legislature established in the Department of Community Affairs, a public body corporate and politic, to be known as the "New Jersey Sports and Exposition Authority." N.J.S.A. 5:10-4. The Legislature found that the general welfare, health, and prosperity of the people of New Jersey would be promoted by the holding of athletic contests, spectator sporting events, trade shows, and other expositions in the State. N.J.S.A. 5:10-2. It further found that the location of a sports and exposition complex in the Hackensack Meadowlands would stimulate needed development in the Meadowlands. Ibid. Therefore, it created NJSEA to provide for the establishment and operation of facilities to hold spectator sports, exhibitions, and other public events and uses in the Hackensack Meadowlands. Ibid. Among its powers, NJSEA was authorized
[t]o determine the location, type and character of a project or any part thereof and all other matters in connection with all or any part of a project, notwithstanding any land use plan, zoning regulation, building code or similar regulation heretofore or hereafter adopted by the State, any municipality, county, public body politic and corporate, including but not limited to the Meadowlands Commission, or any other political subdivision of the State . . . and further excepted that the [NJSEA] shall consult with the [NJMC] before making any determination as to the location, type and character of any project under the jurisdiction of the [NJMC]. . . .
[N.J.S.A. 5:10-5(x) (emphasis added).]
The legislative history of the New Jersey Sports and Exposition Authority Law, N.J.S.A. 5:10-1 to -38, indicates that while NJSEA was exempt from certain development regulations as set forth in N.J.S.A. 5:10-5(x), the Legislature wanted to provide a mechanism for review of the environmental impact of an NJSEA project before it was actually undertaken. See N.J. Sports & Exposition Auth. v. McCrane, 61 N.J. 1, 31-32, 292 A.2d 545, appeal dismissed sub nom., E. Rutherford v. N.J. Sports & Exposition Auth., 409 U.S. 943, 93 S.Ct. 270, 34 L.Ed.2d 215 (1972). Accordingly, it enacted N.J.S.A. 5:10-23, which provides that
[i]t is the express intent of the Legislature that [NJSEA] in undertaking the meadowlands complex shall consult with the [NJMC] and [NJDEP] with respect to the ecological factors constituting the environment of the Hackensack meadowlands to the end that the delicate environmental balance of the Hackensack meadowlands may be maintained and preserved.
N.J.S.A. 5:10-5(x) and N.J.S.A. 5:10-23, therefore, require that before a project is undertaken by NJSEA, it must consult with the NJMC concerning the location, type, and character of the project, and it must consult with the NJMC and NJDEP with respect to any ecological impact to the Hackensack Meadowlands which may emanate from a proposed project.
In 1972, the Supreme Court addressed the statutory requirement that NJSEA consult with NJMC and NJDEP regarding its projects. McCrane, supra, 61 N.J. at 32, 292 A.2d 545. The Court found
that an obligation has been imposed upon the [NJSEA] to present its proposal for site location to the [NJMC] and the [NJDEP], and seek their opinion that in using such site the "delicate environmental balance of the Hackensack meadowlands may be maintained and preserved." This presentation should be made after public notice of the time and place thereof, and actual notice to the parties in the present action. At *983 such time the [NJSEA] and all interested persons should be permitted to present their views on the subject. Although [N.J.S.A. 5:10-23] speaks of the [NJMC] and the [NJDEP], we see no reason why the presentation could not be made to both agencies at the same time. In our view the full record should be and can be made expeditiously at that time, to the end if any further review is sought it may be heard and disposed of upon that record.
[Id. at 32-33, 292 A.2d 545.]
The Court found that informal conferences among the agencies would not satisfy the purpose of the statute. Id. at 33, 292 A.2d 545. The Court noted that the selection and approval of the complex site was a broadly discretionary matter and that a court would not interfere with the decision "unless it is palpably arbitrary." Ibid.
Following the Court's decision, the NJMC and NJDEP announced joint public hearings with respect to NJSEA's proposal to build Giants Stadium and the Meadowlands Racetrack. NJSEA's proposal was filed together with an environmental impact statement prior to the agencies' joint hearing. The hearings were conducted pursuant to the rules and procedures of the Administrative Procedures Act, N.J.S.A. 52:14B-1 to -24. Following the joint hearings, both the NJMC and the NJDEP adopted the 1972 hearing officers' report, which confirmed the selection of the site in question, but made numerous recommendations for changes to the project, primarily concerning environmental issues.
The Supreme Court then reviewed the matter again. In re Sports Complex Hackensack Meadowlands (In re Sports Complex), 62 N.J. 248, 300 A.2d 337, cert. denied, N.J. Citizens for Clean Air, Inc. v. N.J. Sports & Exposition Auth., 414 U.S. 989, 94 S.Ct. 291, 38 L.Ed.2d 228 (1973). The Court reviewed the record of the hearing and noted that "the kind of hearing we suggested was held, and that all interested parties had a fair opportunity to present their views." Id. at 253, 300 A.2d 337. The Court went on to note that the decision approving the site's selection and proposed use "from the point of view of maintaining and preserving the delicate environmental balance of the Hackensack meadowlands has not been shown to be arbitrary." Ibid. The Court explicitly recognized that the consultation directed by the statute "was not itself a quasi-judicial process," rather it was a "quasi-legislative decision of the agencies." Id. at 252, 300 A.2d 337. The Court explicitly found that on "judicial review [of the agencies' decision], the attacking parties of course have the conventional burden of demonstrating, not that the agencies' action was merely erroneous, but that it was arbitrary." Ibid. The Court concluded that the hearing was satisfactory and that the parties were afforded due process. Id. at 253, 300 A.2d 337.
In 1978, NJSEA proposed what became known for a time as the Continental Arena. The NJMC and NJDEP conducted Section 23 and 5(x) proceedings as required by statute. A hearing officers' report was prepared following a hearing that was held jointly by NJMC and NJDEP. The 1978 hearing permitted any parties represented by counsel to cross-examine witnesses offered by NJSEA, and the hearing proceeded as a quasi-legislative hearing without any cross-examination of other witnesses. Following the 1978 hearing officers' report, specific recommendations were made and the Continental Arena proceeded to be constructed.
On June 28, 2002, NJSEA issued a public request for proposals seeking a master developer for "Redevelopment of the Continental *984 Airlines Arena Site." As described in the introduction of the request, NJSEA was seeking to develop the approximately 104 acre arena site east of Route 21 by "creating a multi-use destination at the Arena site that capitalizes on existing uses at the Meadowlands and expands the product mix in a manner that is complementary to those uses, without materially competing with existing businesses in the Meadowlands district." There were a number of proposals submitted. Hartz submitted a proposal, as did The Mills Corporation and Mack-Cali Realty Corporation (collectively Mills). On February 12, 2003, NJSEA's Board adopted a resolution which authorized negotiations to commence regarding a development agreement with Mills for the development of Meadowlands Xanadu at the Continental Airlines Arena site.[2]
As required by N.J.S.A. 5:10-23, NJSEA presented its Xanadu project redevelopment plans to NJDEP and NJMC in a public forum before hearing officers for the two agencies. NJDEP's Chief of Staff, Gary Sondermeyer, and the NJMC's Executive Director, Robert Ceberio (Ceberio), served as the consultation process hearing officers, with retired Judge Alvin Weiss serving as the presiding officer during the public hearings portion of the consultation process.
The hearing officers initially held a "scoping hearing" on March 3, 2004, to provide draft materials and accept public testimony regarding the proposed scope of an Environmental Impact Statement (EIS) that was needed for the consultation.
NJSEA presented an almost 3000 page preliminary EIS for public review in April 2004. It was this document that the interested parties were to comment upon during the April 2004 public hearings.
With only minor variations between them, the preliminary and final EIS, submitted in August 2004, both set forth a general description of the planned Xanadu project. Xanadu was planned as a "unique, visually compelling mixed-use development. . . that would provide a year-round venue of new and complementary uses at the Meadowlands Sports Complex." Xanadu aimed to provide "a multi-use attraction with diverse components of sports and entertainment, retail, select restaurants, hotel with conference facilities, and Class A offices that complement and enhance the NJSEA's existing Meadowlands attractions." The final EIS further provided:
Meadowlands Xanadu consists primarily of Entertainment/Retail, Office, and Hotel uses, with an emphasis on participatory sports and recreation venues. The Project components total approximately 4.96 million square feet of gross buildable area, with a total construction cost of over $1.3 billion.
The Entertainment/Retail component of the Project totals approximately 2.7 million square feet of gross buildable area, of which, 1.5 million square feet are related to participatory sports, entertainment, children's education and home-and-life activities, 700,000 square feet are related to fashion activities and the remaining 500,000 square feet are related to common space. The Entertainment/Retail Center is proposed to include several participatory sporting and recreational venues such as: the nation's first indoor alpine skiing facility with real snow, chair lifts, and lodge; an *985 indoor wave machine for surfing; indoor-outdoor golf; outdoor-type fishing and archery classes; and an indoor mini-Formula One race track. An extreme wheel sports (BMX biking, skateboarding, and in-line skating) skate park is also proposed, which will have a 2,000-2,500 seating capacity along with live television broadcasts. In addition, there will be an outdoor ferris wheel and roller coaster as part of the Entertainment/Retail Center. A Children's Education area will provide a variety of educational venues for children (and adults) of all ages. The Fashion area will include a related luxury spa, salon services, retailers, a cooking school, and fashion shows. A 6,000-8,000 seat stadium is also proposed to serve outdoor sports venues such as the Bergen Cliff Hawks minor league baseball team, the Bergen River Dogs professional lacrosse team, various Little League tournaments and Special Olympics events.
The Office component will consist of four office buildings (440,000 SF each) providing high-rise Class A space totaling 1.76 million square feet of gross buildable area. The office buildings have been paired together, with each set of two buildings sharing common parking. The Hotel component will consist of a first-class hotel with 520 rooms and conference facilities, totaling 500,000 square feet. Minor improvements and extensions to existing sanitary sewers and water mains are proposed. Also as part of the Project, the Developer proposes to convey the Empire Tract, a 587-acre open space wetland area located just north of the Arena Site, to a State-designated entity.
The EIS also set forth off-site transportation improvements envisioned for the project including: realigning the entrance and exit ramps from northbound Route 120, and the ramp from Paterson Plank Road, accommodating a new parking deck for Xanadu; adding a new flyover ramp from the Route 3 service road to a new service road along northbound Route 120, widening southbound Route 120 to four lanes and adding a second lane to the ramp from there onto westbound Route 3, and re-striping the two-lane ramp from southbound Route 120 as it merges onto eastbound Route 3 to improve traffic flow on the ramp. The EIS referenced a "detailed Event Parking and Traffic Management Plan" that was "currently being developed by NJSEA and the Developer."
The EIS described four phases of construction. Phase I, projected for 2004-2005, involved constructing 1675 parking spaces, filling undeveloped areas, including 7.69 acres of wetlands, and modifying some of the existing interior road network and the ramp connections to Route 120. Phase II, projected for 2004-2006, involved constructing the "Entertainment/Retail Center," constructing parking decks for 6325 more parking spaces, relocating a portion of the interior roads, and "assuming favorable economic and marketing conditions," constructing a minor league baseball stadium. Phase III involved constructing the first office building and its 1125-space parking deck, the "Hotel component or portion thereof" and the associated office and hotel circulation roads. Phase III and Phase IV, projected for 2006-2009, were to be constructed "based on an assumption of favorable economic and market conditions at that time." Phase IV involved constructing any part of the hotel component not completed during Phase III, and the second, third, and fourth office buildings with associated parking decks totaling 3375 parking spaces.
The EIS also listed the numerous regulatory reviews and approvals that would be needed for the Xanadu project. The EIS *986 noted various contaminants associated with historic fill that were found on the Arena site, including some Polychlorinated Biphenyls (PCBs), benzyls (BNs), and metals at levels exceeding NJDEP's non-residential soil cleanup criteria. NJSEA asserted that no special wildlife habitat or threatened or endangered species habitat was identified on the site, except "the Black-crowned Night Heron (Nycticorax nycticorax), a state-listed endangered species for breeding populations only, that was observed on several occasions" in and near "Lagoon G (Lagoon No. 3)" in 2003. NJSEA proposed "[t]he preservation of an approximately 235-acre portion of the Empire Tract . . . as compensatory mitigation for the estimated 7.69 acres of wetlands" to be impacted by the Xanadu project, which would extend the amount of wetlands preservation by "an acreage ratio of approximately 30 to 1."
In the preliminary EIS, there is a review of the traffic issues arising from the project. The study was based upon a traffic impact study prepared for and submitted to the New Jersey Department of Transportation (NJDOT) as part of the major access permit and planning application. The report notes that it was prepared in accordance with current NJDOT regulations and criteria stated in the New Jersey State Highway Access Management Code, N.J.A.C. 16:47. The report goes on to note that, as part of the traffic impact study analysis, six locations were identified that required study under the NJDOT regulations. There were, however, an additional eighteen locations that did not require study under the regulations but were voluntarily studied by the developer to further examine potential traffic impact on the adjacent roadways. It appears from a map attached to the report that all twenty-four sites are within or near the vicinity of the arena site.
Public hearings on the preliminary EIS, as required by the Court in connection with a N.J.S.A. 5:10-23 consultation, took place over five days, from April 26 through April 30, 2004. Written public comments were accepted through May 31, 2004. After NJSEA submitted supplemental EIS information on June 1, 2004, the comment period was extended until July 9, 2004. Numerous comments were submitted about various topics, including traffic and transportation, air quality, and stormwater issues.
In the final EIS submitted in August 2004, a stormwater management study was submitted. In addition, the final EIS contained updated information regarding traffic studies and air quality assessments. In its response to comments that the scope and geographic area of the traffic study was too small, NJSEA responded that it anticipated obtaining permits from NJDOT for access in order to construct the project. It advised that it would follow the guidelines set in the New Jersey State Highway Access Management Code in conducting studies regarding the scope and area of the traffic which needed to be studied. It noted that the traffic impact studies for those locations that were required to be studied by NJDOT met the NJDOT requirements. However, it went on to state that it had undertaken a study to examine the anticipated traffic route on regional roadways that provide access to the complex. NJSEA noted that a discussion regarding this additional ongoing study was contained in the final environmental impact statement.
The hearing officers prepared a report and recommendations dated August 19, 2004 ("the joint consultation report," sometimes also called "the section 23 report"). In NJMC and NJDEP's joint report, the agencies required compliance with the stormwater management rules recently *987 adopted by NJDEP. It, therefore, provided that NJSEA had to revise and submit its stormwater management plan to NJDEP as part of the project's permanent application submission.
The agencies particularly pointed out that the traffic impact analysis did not address the impact on the regional road network. It, therefore, required a new traffic impact analysis, with a recommended minimum radius of four miles from the proposed project boundaries. It also recommended that there be a better breakdown of the amount of area associated with each type of use at the project in order to better estimate the traffic. The report also required corrections to the credits for pass-by trips contained in the traffic analysis.
The hearing officers also required that a revised air quality analysis be submitted to NJDEP. The hearing officers' report concluded the Meadowlands Xanadu Project may advance, provided the project complied with the numerous conditions contained in the report. The hearing officers required the submission of quarterly reports to NJDEP and NJMC to demonstrate compliance with the conditions set.
NJMC's Ceberio also separately served as a hearing officer regarding the review of the "location, type, and character" of development on the Meadowlands Sports Complex site, as part of NJSEA's required consultation process pursuant to N.J.S.A. 5:10-5(x). In that role, Ceberio issued another report, also dated August 19, 2004 ("the Commission's report," also called "the section 5(x) report").
According to both Hartz and Sierra, the joint consultation report and the Commission's report were not made available to the public until August 24, 2004. Two days later, at its August 26, 2004, meeting, NJMC approved its Resolution No. 04-60, adopting both the joint consultation report and the Commission's report.
On October 1, 2004, NJDEP Commissioner Campbell entered a four-page order "adopting and revising the Hearing Officers' Report and recommendations, while setting forth additional provisions to ensure compliance with, and enforcement of, the terms and requirements of the Report." Regarding compliance and enforcement, Campbell ordered and directed that the terms of the joint consultation report and of his order should be incorporated into a revised developers' agreement within sixty days of the order, unless the NJSEA and developer could show cause why that revision could not be completed.
On October 12, 2004, Hartz filed its notice of appeal from NJMC's Resolution No. 04-60 and from NJDEP Commissioner's October 1, 2004, order. On the same date, Sierra filed a notice of appeal from NJMC's Resolution No. 04-60; it later filed an amended notice of appeal to also appeal from NJDEP Commissioner's October 1, 2004, order. In January 2005, we entered an order consolidating these two appeals. Another appeal regarding these same issues, A-1001-04T1, had been filed by the Borough of Carlstadt and was consolidated with the present matters, but that appeal was dismissed by stipulation on May 10, 2006. Emergent applications were thereafter filed to stop construction activity; these all were denied.
In August 2005, Hartz filed a motion to supplement the record on appeal with an October 1, 2004, letter from the President of The Mills Corporation's Development Division, James F. Dausch (the Dausch letter). According to Hartz, the Dausch letter showed that the consultation hearing testimony by Mills' witnesses was "at best incomplete, more likely intentionally misleading, and now demonstrably false." By order filed on September 19, 2005, we *988 granted Hartz's motion to supplement the appellate record with the Dausch letter and with other materials, leaving the parties free to argue whether those items were relevant to any issues on appeal.

II. POINTS OF APPEAL

On appeal, Sierra raises the following points for our consideration:
POINT I
THE NJDEP AND THE NJMC FAILED TO COMPLY WITH THE STATUTORY REQUIREMENTS AND FAILED TO ADEQUATELY EXPLAIN AND BASE THEIR DECISION UPON EVIDENCE IN THE RECORD.
POINT II
THE NJMC'S AND THE NJDEP'S SECTION 23 AND 5(X) PROJECT APPROVALS WERE NOT SUPPORTED BY EVIDENCE IN THE RECORD.
A. DUE TO THE ACKNOWLEDGED DEFICIENCIES IN THE RECORD, THE NJDEP AND NJMC HAD NO BASIS FOR THEIR DECISIONS TO APPROVE THE PROJECT.
POINT III
NJMC'S AND NJDEP'S SECTION 23 PROJECT APPROVALS MUST BE VACATED AND REMANDED TO THE HEARING OFFICERS BECAUSE THE AGENCIES LACKED AUTHORITY TO CONDITION THEIR APPROVAL ON THE SUBMISSION OF CRITICAL INFORMATION AT SOME LATER DATE.
A. NEITHER NJDEP NOR NJMC HAVE BEEN DELEGATED AUTHORITY TO GRANT CONDITIONAL APPROVALS.
B. BASIC PRINCIPLES OF STATUTORY CONSTRUCTION PREVENT THE STATE AGENCIES FROM READING AUTHORITY FOR CONDITIONAL APPROVALS INTO THE NJSEA AUTHORIZING LEGISLATION.
C. NJMC AND [NJ]DEP COULD NOT VALIDLY APPROVE THE PROJECT UNDER SECTION 23 WHEN THEY LACKED COMPLETE INFORMATION.
D. THE XANADU PROJECT DESERVES AT LEAST AS MUCH SCRUTINY AS ROUTINE LAND USE DETERMINATIONS UNDER THE MLUL.
E. NJMC AND [NJ]DEP CANNOT JUSTIFY THEIR CONDITIONAL SECTION 23 APPROVAL ON THE GROUNDS THAT MISSING INFORMATION WILL BE CONSIDERED IN FUTURE PERMITTING PROCESSES.
POINT IV
THE NJMC AND NJDEP FAILED TO PROVIDE ADEQUATE NOTICE AND OPPORTUNITY FOR COMMENT.
A. THE NJDEP ILLEGALLY RELIED ON EVIDENCE OUTSIDE THE RECORD IN APPROVING THE XANADU PROJECT.
B. THE PUBLIC WAS NOT AFFORDED AN OPPORTUNITY TO COMMENT ON OR FILE BRIEFS ON EXCEPTION FROM THE HEARING OFFICERS' REPORT PRIOR TO ITS ADOPTION BY NJDEP AND NJMC.
C. APPELLANTS WERE DEPRIVED OF ANY REALISTIC OPPORTUNITY TO COMMENT UPON THE HEARING OFFICERS' REPORT PRIOR TO ITS APPROVAL BY THE NJMC.
On appeal, Hartz raises the following points for our consideration:

*989 POINT I

THE NJMC AND NJDEP ERRED IN FAILING TO CONDUCT A QUASI-JUDICIAL HEARING PURSUANT TO N.J.S.A. 5:10-5X AND -23.
POINT II
THE FAILURE OF THE NJMC AND THE NJDEP TO DETERMINE THE APPROXIMATE MIX OF USES PROPOSED BY THE NJSEA AND MILLS FOR THE XANADU PROJECT RENDERED THE SECTION 5X AND 23 APPROVALS INVALID AS AN ARBITRARY AND CAPRICIOUS ACTION AND AN ABUSE OF THESE AGENCIES' DISCRETION.
POINT III
THE NJDEP ORDER IS A NULLITY INSOFAR AS IT PURPORTS TO UNILATERALLY MODIFY THE CONDITIONS IN THE SECTION 23 REPORT AS APPROVED BY NJMC RESOLUTION NO. 06-04.
POINT IV
NJDEP COMMISSIONER CAMPBELL'S ACTION IN APPROVING "EARLY START" CONSTRUCTION ACTIVITIES WAS CONTRARY TO EO 215 AND N.J.S.A. 5:10-5X AND -23 AND SO TAINTED THE ISSUANCE OF THE SUBJECT NJDEP ORDER THAT THE COURT SHOULD INVALIDATE IT.
POINT V
THIS COURT SHOULD REVERSE THE SUBJECT APPROVALS BECAUSE THEY ARE CONTRARY TO THE PUBLIC TRUST DOCTRINE.
POINT VI
THE AGENCIES' APPROVALS ARE VOID AS ARBITRARY AND CAPRICIOUS BECAUSE RATHER THAN ADEQUATELY STUDYING ALTERNATIVES TO THE DESTRUCTION OF WETLANDS OR THE PROJECT'S IMPACT ON THE ENVIRONMENT AND TRAFFIC PRE-APPROVAL, THE AGENCIES DEFERRED THESE ISSUES FOR FUTURE MONITORING THUS CONCEDING THAT PRESENTLY THERE WAS AN INSUFFICIENT RECORD TO SUPPORT THE APPROVALS.
A. THE NJMC ABDICATED ITS RESPONSIBILITY TO DETERMINE THE APPROPRIATENESS OF THE PROJECT SITE'S LOCATION.
B. THE HEARING OFFICERS HAD INADEQUATE INFORMATION TO DETERMINE TRAFFIC AND AIR QUALITY IMPACTS.

III. LEGAL DISCUSSIONTHE CONSULTATION PROCESS

We begin our consideration of the issues advanced on appeal by restating the principles derived from a reading of McCrane, supra, 61 N.J. 1, 292 A.2d 545, and In re Sports Complex, supra, 62 N.J. 248, 300 A.2d 337. The Supreme Court has stated that the consultation mandated under N.J.S.A. 5:10-5(x) and 5:10-23 requires more than "informal conferences." McCrane, supra, 61 N.J. at 33, 292 A.2d 545; In re Sports Complex, supra, 62 N.J. at 251, 300 A.2d 337. Rather, a hearing is required following public notice of the time and place thereof. The hearing should be conducted as a quasi-legislative hearing and all interested parties should be permitted to present their views. Should a person seek judicial review of the consultation decision of an agency, that person would bear the burden of demonstrating that the agency's action was not "merely erroneous but that it was arbitrary." In re Sports Complex, supra, 62 N.J. at 252, 300 A.2d 337.
At the outset, we note that the two statutes at issue require NJSEA to "consult *990 with" and not "obtain the approval of" NJMC and NJDEP with respect to a NJSEA project. N.J.S.A. 5:10-5(x) & -23. Statutory words must be "given their generally accepted meaning `unless inconsistent with the Legislature's manifest intent or unless another meaning is expressly indicated.'" Nebinger v. Md. Cas. Co., 312 N.J.Super. 400, 406, 711 A.2d 985 (App. Div.1998) (quoting Stevenson v. Keene Corp., 254 N.J.Super. 310, 317, 603 A.2d 521 (App.Div.1992), aff'd, 131 N.J. 393, 620 A.2d 1047 (1993)). Because the Legislature has not given any special meaning to the word "consult," therefore, we must give it its ordinary meaning. Stevenson, supra, 254 N.J.Super. at 317, 603 A.2d 521. The definition of "consult" is "to seek an opinion from; ask the advice of." Webster's New World College Dictionary (4th ed. 2002).
New Jersey's Legislature has in at least eight other statutes[3] required NJDEP to consult with various agencies and public bodies and there are over 170 other statutes[4] requiring legislatively created agencies or boards to consult with other state, federal, and private agencies, boards, commissions, or associations or representatives thereof. It is clear, therefore, that the Legislature is particularly aware of the impact and meaning ascribed to inter-agency governmental consultation as opposed to subjecting one agency's action to the approval of another.
However, our laws and regulations do not specifically set forth the substantive and legal requirements for a legislatively mandated consultation, such as that required in this case.[5] Because neither the Legislature nor the agencies involved have set forth regulations defining the procedure and substance of such a consultation, we must look to case law to define those parameters.
After a review of McCrane and In re Sports Complex, it appears that there are certain procedural and substantive requirements that must be met in order to comply with the Legislature's mandate for consultation under N.J.S.A. 5:10-5(x) and -23. First of all, NJSEA must submit in writing to NJMC and NJDEP a description of its proposed project, as well as an environmental impact statement. A hearing must be scheduled, which would afford the public an opportunity to comment on the proposal. There must be sufficient notice and opportunity to review the proposal before the hearing. The hearing should be conducted as a quasi-legislative hearing, as opposed to a quasi-judicial hearing. NJMC and NJDEP must each provide an opinion which informs NJSEA of its views as to the location and site of the project as well as its views regarding the project's ecological impact with particular emphasis on whether the project will disturb the environmental balance in the Hackensack Meadowlands. Lastly, the consultation process *991 must result in NJSEA giving every consideration to the concerns and conditions raised in the agencies' opinions. See Rutgers v. Piluso, 60 N.J. 142, 154, 286 A.2d 697 (1972).
Having outlined the procedural and substantive requirements of a consultation pursuant to the statute at issue, the question then becomes what is the legal efficacy of the agencies' resolutions adopting the hearing officers' recommendations and conditions. As stated earlier, the agencies are consultants, not arbiters with respect to a proposed project. They are not charged with approving the project, but rather giving their opinion and recommendations concerning it. See N.J.S.A. 5:10-5(x) & -23. Their recommendations do not directly bind NJSEA.
We note, however, that NJSEA should give the agencies' recommendations every consideration; and if it were to ignore same, it would proceed at its peril, as it would then be faced with potential prerogative writ suits questioning its action as in conflict with its statutory authority. The NJSEA could face a legislative reaction as well.
We note that an advisory opinion of an administrative agency is ordinarily not appealable. In re Application of Jackson Twp., 350 N.J.Super. 369, 372, 795 A.2d 318 (App.Div.2002); N.J. Civil Serv. Assoc. v. State, 88 N.J. 605, 611, 443 A.2d 1070 (1982). The Supreme Court has declined to review mere "opinions" or "conclusions" of administrative officers on which no official action was based. An advisory opinion by the Attorney General to an agency is not eligible for appeal. In re Application of Jackson Twp., supra, 350 N.J.Super. at 372, 795 A.2d 318. Even specific agency determinations made as recommendations have been held not to be final. In re Zion Towers Apartments (HMFA # 2), 344 N.J.Super. 530, 536, 782 A.2d 956 (App.Div.2001). Strictly speaking then, Hartz's and Sierra's appeal is not from a final decision of a state agency. See R. 2:2-3(a)(2); Jackson Twp., supra, 350 N.J.Super. at 372, 795 A.2d 318. It appears that the proper route for judicial review of NJMC and NJDEP actions would have been by way of an action in lieu of prerogative writs initially filed in the Law Division or by direct review of NJSEA's action taken in response to the agencies' recommendations. However, given the present procedural posture and the interests of judicial economy, we will treat the appeal as a motion for leave to appeal and grant the motion. See R. 2:4-4(b)(2).
The final general matter to be addressed before reviewing the individual points raised on appeal is our scope of review. Where a statute requires one governmental agency to consult with another concerning a matter, our scope of review is limited to determining, first of all, if the agency complied with those procedures statutorily required, or as required by case law in conducting such a consultation. See McCrane, supra, 61 N.J. 1, 292 A.2d 545. Secondly, we are to review any opinion and recommendation produced by the agency to determine if it was based on sufficient proofs to support its conclusions and recommendations, giving due deference to the agency's expertise, and whether the recommendations, are "palpably arbitrary." Ibid.; In re Sports Complex, supra, 62 N.J. 248, 300 A.2d 337. With those principles set forth, a review of Hartz and Sierra's points is now appropriate.

A. Did NJDEP And NJMC Err In Failing To Conduct A Quasi-Judicial Hearing (Hartz's point I)?

Hartz contends that the joint consultation hearing process should have involved *992 a quasi-judicial hearing, because it was, in essence, a process in lieu of the traditional municipal zoning or planning board review. Those hearings require a presentation by the developer and afford objectors the opportunity to cross-examine the applicant and any witnesses. Hartz and Sierra both note that in 1972, when NJSEA was initially developing the Meadowlands Sports Complex, the joint consultative process with NJDEP and NJMC included a five-week-long quasi-judicial hearing with the right to call and cross-examine witnesses. They argue that because in In re Sports Complex, supra, 62 N.J. at 253, 300 A.2d 337, the Supreme Court concluded that "the kind of hearing we suggested was held" the agencies erred in "watering down" the procedures by eliminating cross-examination of witnesses by objectors, and erred in glossing over the differences between the 1972 hearing procedures and the present hearings in the joint consultation report. As a result, Hartz argues "neither the NJSEA nor Mills has ever had to answer a single question from any of the objectors about the retail nature of its project, or the likely negative traffic, environmental pollution, and socio-economic impacts." Hartz urges that we reverse the approvals as void and remand for a new quasi-judicial hearing.
We find no merit in this argument. "A strong presumption of reasonableness accompanies an administrative agency's exercise of statutorily-delegated responsibility." Gloucester County Welfare Bd. v. State Civil Serv. Comm'n, 93 N.J. 384, 390, 461 A.2d 575 (1983).
Normally courts defer to the procedure chosen by the agency in discharging its statutory duty. Subject to the requirements of due process and of the Administrative Procedure Act, an agency may choose how to proceed. Accordingly, it is within the agency's discretion "to select those procedures most appropriate to enable the agency to implement legislative policy."
[In re Request for Solid Waste Util. Cust. Lists, 106 N.J. 508, 519, 524 A.2d 386 (1987).]
A need for a hearing is determined by whether the administrative agency is acting in a legislative or a quasi-judicial capacity. High Horizons Dev. Co. v. State Dep't of Transp., 120 N.J. 40, 50, 575 A.2d 1360 (1990). In this case, the Court has made it clear that a quasi-legislative hearing is what is required by the agencies. In re Sports Complex, supra, 62 N.J. at 252, 300 A.2d 337. A trial-type administrative hearing is guaranteed by statute only for those proceedings in which "legal rights and duties of specific parties are required by statute or constitutional right to be determined by an agency." J.E. ex rel. G.E. v. Dep't of Human Servs., 131 N.J. 552, 562, 622 A.2d 227 (1993). That is not the case in this matter.
In this case, the procedural process was as follows:
Following the Scoping Hearing, the EIS documents were completed and made available for public review at the NJMC and NJDEP offices and the Meadowlands constituent municipalities' libraries. Public hearings for the EIS, as required by the N.J.S.A. 5:10-23 consultation, took place daily during the week of April 26, 2004, through April 30, 2004. Public comments were received on the record at each session. Additionally, written comments were accepted up to the close of business on May 31, 2004. The applicant [NJSEA] submitted additional information to supplement the EIS record on June 1, 2004. Notice was provided as to the availability of this supplemental data and the comment period was extended until July 9, 2004, for further written comments from the public. *993 In total, the EIS public hearings covered over twenty-six (26) hours. One hundred seven (107) individuals presented oral comments and over six hundred (600) written comments were received by the Hearing Officers.
[Hearing Officers' Report And Recommendations In The Matter Of The Hearings Held On The Proposed Meadowlands Xanadu Redevelopment Project (Apr. 26-30, 2004), p. 9-10.]
There is no statutory or constitutional right to a quasi-judicial hearing in this case. On this record, we conclude that Hartz and Sierra have not met their burden of demonstrating that the agencies' action in carrying out the Xanadu hearing process was arbitrary. The hearing held afforded a sufficient opportunity for public comment.

B. Was There Insufficient Evidence Presented To Support NJDEP And NJMC Opinions, Particularly Regarding The Traffic And Air Quality Impact Of The Project (Sierra's points I, II, III.C. and III.D.; Hartz's points II and VI.B.)?
Sierra and Hartz contend that the "approvals" are invalid because they were granted without adequate review of numerous issues, especially traffic and transportation, air quality, and stormwater issues, that were essential to fulfilling the statutory mandate for the review. Sierra describes how thoroughly those issues were addressed in the section 23 hearings regarding the Meadowlands Sports Complex improvements in 1972 and 1978. Sierra references the Municipal Land Use Law (MLUL), N.J.S.A. 40:55D-1 to -163, where similar types of development reviews are performed by planning and zoning boards, and argues that a project as large as Xanadu deserves at least that same level of scrutiny. Hartz particularly takes issue with the agencies having granted the approvals without sufficient information in the record as to the exact extent of the retail uses that the Xanadu project would contain. Hartz further asserts that NJMC "[a]bdicated its [r]esponsibility" to determine the appropriateness of the Xanadu project's site location.
In response to the arguments by Hartz and Sierra that the record was inadequate for NJMC and NJDEP to perform their consultation obligations under section 23 and section 5(x), those two agencies jointly asserted that their approach in reviewing these matters was appropriate.

Traffic
The responses to public comments on traffic and transportation impacts were set forth in section 4.14 of the final EIS document. Several of the comments criticized the traffic study's insufficient scope. NJSEA repeatedly defended the study, saying that it met the NJDOT requirements for the access permit needed for the project.
In the joint consultation report, the hearing officers agreed with the commentators regarding the insufficient scope, writing that
this NJDOT permitting process is intended solely for the purpose of modifying or renovating driveway access to a particular site and does not require an assessment of the effect a project may have on traffic volumes or movements on the regional roadway network beyond the immediate locale of the subject site. The study area for a complete traffic impact analysis for a project of Xanadu Meadowlands' scale must extend far beyond the requirements set forth by the State Highway Access Management Code. A new traffic impact analysis must be prepared evaluating the impact to roadways, intersections, and merges *994 from the proposed development for applicable peak time periods. Such a report should also include recommended ways to mitigate impacted locations. In order to properly evaluate the traffic impact, the applicant is advised to assess all major nodes and links within a regional context (recommended minimum radius of four (4) mile from the proposed project boundaries).
[Hearing Officers' Report And Recommendations, supra, p. 27 (emphasis added).]
Further specifying the information needed, the hearing officers required NJSEA to submit a list of key data collection points for the study, which list must include, but not be limited to: "NJ Route 3 corridor from NJ Route 21 to Interstate 495," "NJ Route 17 corridor from Interstate 80 to NJ Route 3," "NJ Route 17 and Moonachie Avenue intersection," "Paterson Plank Road from the New Jersey Turnpike to NJ Route 17," "NJ Route 120/Washington Avenue/Moonachie Road from NJ Route 3 to Route 46," and "New Jersey Turnpike Interchange[s] 16W and 18W." They further specified: "Traffic count data must be collected for at least 3 days at each of the study locations. The counts may not be taken on Fridays or on the day immediately before or after a holiday." Traffic count data for the traffic impact analysis also would need to incorporate a two percent annual growth rate for the existing traffic volumes, compounded annually, to comport with general industry standards.
The hearing officers also found inadequate the type of project information supplied for the traffic analysis, stating that to properly calculate trip generation for a traffic study for Xanadu, "a breakdown of the amount of square footage associated with each type of use is necessary." The report noted particularly that the "family entertainment" designation for portions of Xanadu "must be defined by its potential subparts reflecting standard land uses recognized by the Institute of Transportation Engineers (ITE) for purposes of calculating trip generation, (i.e. retail, restaurant, movie theater, etc.)." The hearing officers noted that the reports submitted by NJSEA "attempted to equate the family entertainment use to a `value-oriented retail center' and/or `factory outlet center' use with regard to trip generation, but the documents did not demonstrate a factual basis from an impartial source for drawing that parallel."
The joint consultation report also criticized the use of two types of credits in the EIS's traffic impact analysis. The report found that the EIS incorrectly included credits for "pass-by trips," a designation that refers only to intermediate stops along the roadway itself, not the kinds of diversions off one roadway onto another that would be required to access Xanadu. The Xanadu traffic flow might be available for credits for "diverted linked trips," but the new traffic study would need to comply with ITE standards to determine whether that type of credit would apply. NJSEA also had failed to support its application of a "25% PM event credit" to the traffic analysis. The hearing officers wrote that "[a] separate detailed study validating such a large reduction would need to be submitted with any revised traffic impact analysis in order to receive such a credit."
The hearing officers further required NJSEA to revise its discussion of the "Event Parking and Transportation Management Plan" so that the plan would be "in direct agreement with the traffic impact study's vehicle distribution and industry standard parking space requirements." Those revisions should include safe pedestrian access plus "tabular accounts of space allocation per parking lot or deck *995 and per use," noting again that the "family entertainment" designation needed to be separated into "more defined sub-categories" of land use for purposes of this analysis. The revisions were also required to include more detailed information regarding the control of onsite traffic flow, traffic signals, analysis of ingress and egress for all the parking lots and decks, and analysis of "the complete system of on-site traffic flow including access points, collection of parking fees, queuing, interior maneuvering, and parking of vehicles."
The hearing officers stated that the Xanadu developers "shall financially contribute their share of the cost of infrastructure improvements that are deemed necessary, in accordance with NJDOT standards and formulas." The hearing officers also required: "Additionally, the NJSEA shall place a dedicated fee on tickets for all events at the Sports Complex, which shall be directed into a fund dedicated for mass transit and local roadway improvements in the region." The amount of the fees had to be determined by January 15, 2005, and submitted as part of the first quarterly progress report. The hearing officers further suggested that the NJSEA and Mills consider dedicating a portion of the parking fees from the Sports Complex and Xanadu to this fund.
The joint consultation report further required Xanadu's "owner/operator" to enter into an agreement with the region's transportation management association "Meadowlink" to manage the transportation needs of Xanadu employees, with strategies such as shuttle buses, ridesharing, parking cash-outs, and transit incentives. Moreover, noting proposals to provide train or light rail access to the site, the report stated: "Until rail access is realized, the developer shall subsidize and/or provide shuttle bus services between the Meadowlands Xanadu/Meadowlands Sports Complex from the Secaucus Junction Train Station and from the Port Authority Bus Terminal in New York City."
As noted previously, the Meadowlands Commission passed Resolution No. 04-60, which stated that the Commission "adopts the findings and recommended requirements" of the joint consultation report. At the hearing leading up to the adoption of that resolution, then-Commissioner of the Department of Community Affairs, and Chair of the Meadowlands Commission, Susan Bass Levin, relied upon the shuttle bus requirement, among other requirements, in urging adoption of the joint consultation report.
In his order "adopting and revising" the joint consultation report, then-NJDEP Commissioner Campbell wrote that two provisions in the joint consultation report regarding transportation "warrant revision," namely the requirement of shuttle bus service until rail service is available and the requirement of a dedicated fee on all events tickets to deposit into a mass transit and roadway improvements fund. In Campbell's view, these requirements were in tension with more general requirements that the developer would be responsible for all on-site transportation improvements and for its fair share of the costs of all off-site improvements attributable to Xanadu. Campbell found it inappropriate to surcharge ticket buyers for an expense that the developer was obligated to undertake. Moreover, the surcharge requirements would be onerous to administer and were of "dubious legality" because they could conflict with the NJSEA's contractual obligations with the Giants or the other sports franchisees. Campbell further found that the shuttle bus requirement was "premature" in advance of the additional transportation analysis, which might show the need for a greater or lesser level of service, or none at all.

*996 Xanadu Air Quality

The responses to public comments on air quality issues were set forth in section 4.15 of the final EIS document. Several of the comments criticized the air quality analysis's insufficient scope because its "conformity analysis" was linked only to the construction activities relating to filling the wetlands and more study was needed regarding other construction and operation activities. NJSEA responded that only the wetlands filling led the United States Army Corps of Engineers to require an air quality conformity analysis. NJSEA further stated that it focused its air quality impact study on traffic, the likely source of pollution related to Xanadu, and set forth a quantitative analysis in the preliminary and final EIS documents. NJSEA considered it appropriate to this kind of a project to discuss air quality issues relating to construction and stationary source emissions such as boilers and heating and air conditioning systems. Another comment noted that if the traffic study was adjusted, the air quality results "would be questionable," but NJSEA responded that the NJDOT had not required any traffic study changes that would affect the air quality analysis.
In the joint consultation report, the hearing officers agreed with the comments that more analysis was needed, writing:
The EIS exhibited that the project meets the de minimis levels for the federal action component of the site the wetlands fill area. This assessment of impact to air quality from construction and operations of the proposed facilities must be broadened to assess the entire Xanadu project area, not just the wetlands area that falls under the federal jurisdiction criteria.

[Hearing Officers' Report And Recommendations, supra, p. 32 (emphasis added).]
The joint consultation report noted further that the air quality analysis relating to vehicular emissions would need to be "reassessed subsequent to the traffic analysis update" and submitted to NJDEP. That analysis would need to include a scenario that accounted for multiple activities taking place at one time on the Sports Complex and Xanadu sites. The hearing officers also required more information in the progress reports beginning in January 2005 as to the details of NJSEA's commitment to reduce diesel emissions from construction equipment on the site.
Further, the hearing officers wrote: "In reviewing the data, the substantial increase of on-site traffic for prolonged periods of time raises concern with regard to air quality." Accordingly, NJMC and NJDEP "require that air quality data, for PM 2.5 in particular, shall be continuously gathered and analyzed throughout construction and post construction on the site." The hearing officers further required more information relating to the air quality effects of the parking decks, including information about the amount of area that would be enclosed, the manner of ventilation, and the number of entrances and exits for each parking deck. Indicating that NJSEA's reference to compliance with a permit requirement was insufficient, the hearing officers also required specific information regarding the stationary sources of emissions from heating and cooling systems. They further required an on-site monitoring station to gather and analyze local air quality data, and if the monitoring showed that mobile or stationary sources were making a significant impact on the area's air quality, they required NJSEA to submit a mitigation plan to NJDEP.

Xanadu Stormwater Management
The responses to public comments on stormwater issues were set forth in section *997 4.13 of the final EIS document. Several of the comments questioned the thoroughness of the stormwater management planning or the EIS's discussions thereof. NJSEA responded that it had provided ample information in Appendix B to its preliminary EIS, and that a revised Stormwater Management Report was included as Appendix C to the final EIS. NJSEA noted further that at the time of the joint consultation report, the stormwater issues remained pending in the NJDEP's permitting process. NJSEA further noted that the water quality of stormwater runoff would significantly improve, because with the increased number of buildings, the site's runoff "will no longer sheet drain across expansive areas of surface parking areas as it presently does," so less rainfall would collect oil drippings, road salts, and other surface area contaminants. NJSEA also abandoned its plan to route a stormwater outfall to the Empire Tract.
In the joint consultation report, the hearing officers agreed with the commenters that more analysis was needed, writing: "Overall, the stormwater evaluation performed by the applicant was not in conformance with the newly adopted NJDEP Stormwater Management Rules at N.J.A.C. [7:8-1.1 to -6.3]. It must be revised and submitted to the NJDEP as part of the project's permit application submission." The hearing officers listed ten areas of information that needed to be addressed in the new analysis, and also noted the need for an operation and maintenance plan for the stormwater system.
In essence, Sierra and Hartz argue that NJMC and NJDEP's recommendation that the Xanadu project advance, subject to conditions, was arbitrary and without sufficient basis in the record because comprehensive traffic, air quality, and stormwater information was not presented or available to the agencies so as to make their recommendation inadequate and deficient.
Our capacity to review administrative actions is limited. Gloucester County Welfare Bd., supra, 93 N.J. at 390, 461 A.2d 575.
Though sometimes subsumed in the search for arbitrary or unreasonable agency action, the judicial role is restricted to three inquiries: (1) whether the agency action violates the enabling act's express or implied legislative policies; (2) whether there is substantial evidence in the record to support the findings upon which the agency based application of legislative policies; and (3) whether, when applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made upon a showing of the relevant factors.
[Pub. Serv. Elec. v. N.J. Dep't of Envtl. Prot., 101 N.J. 95, 103, 501 A.2d 125 (1985) (internal citation omitted).]
With respect to determining whether the agencies' recommendation violates section 23 and section 5(x)'s expressed or implied legislative policies, we are satisfied that is not the case. Section 23 and section 5(x) clearly express the legislative requirement that NJSEA consult with the agencies concerning any of its proposed projects. The policy of the Legislature is to have NJSEA benefit from the expertise of the agencies with respect to the topics consulted on and to permit NJMC a voice in the development of a portion of the Hackensack Meadowlands. We note that N.J.S.A. 5:10-23, the statute against which any opinion is to be measured concerning the environment, is focused solely on assuring that the delicate environmental balance of the Hackensack Meadowlands is maintained and preserved. This statute does not require an environmental *998 impact of any proposed NJSEA project on a region other than the Meadowlands. Consequently, the lack of a traffic study, which focuses on the environmental impact of a project on areas beyond the Meadowlands, was not within the statutory charge directed to NJDEP and NJMC.
However, in examining whether there was substantial evidence in the record to support the recommendations of the agencies, we note that the preliminary environmental impact statement was lengthy and detailed. Moreover, the agencies specifically noted those areas that were lacking. The agencies, applying their expertise, pointed out what studies must be done in order for the proposed project to, in their opinion, be environmentally sound and properly located. The agencies found the Xanadu project to be satisfactory as to its ecological impact on the Meadowlands, and in its location and site, provided certain specific studies were conducted, and that NJSEA and the developer responded appropriately to those studies as the project was being developed. In order to be assured that these studies and any subsequent remedial action be taken, the agencies required that there be quarterly reporting requirements to monitor this situation. There is substantial evidence in this record to support their course of action. The same template was used with respect to the 1972 and 1978 opinions of the agencies with respect to other earlier developments by NJSEA in the Meadowlands.
While we may have been more comfortable with a regional traffic study, more detailed air quality assessments, and a completed groundwater application having been submitted before the agencies issued their opinion, we recognize that normally an agency's action is subject to a deferential standard of review, particularly where agencies exercise a technical expertise that is not possessed by the court. Lipman v. Rutgers-State Univ. of N.J., 329 N.J.Super. 433, 441, 748 A.2d 142 (App.Div.2000).
Lastly, we must examine whether the agencies clearly erred in reaching their conclusions because the conclusions could not reasonably have been made upon a showing of the relevant factors. In other words, we must determine whether the agency action was arbitrary. The agencies chose, without having certain studies done, to issue their opinion on condition that the studies be done, that the developer and NJSEA be responsible for completing these studies, as well as devising and paying for any action that the studies indicate would be required. The agencies ensured compliance by requiring quarterly reporting to them. The agencies demonstrated their expertise in recognizing exactly what studies would be required. It also falls within their expertise to opine that with the required study, the NJSEA and the developer would be able to respond to any action that might be required.
The term "arbitrary and capricious" in the law means having no rational basis. Bayshore Sewerage Co. v. Dep't of Envtl. Prot., 122 N.J.Super. 184, 199, 299 A.2d 751 (Ch.Div.1973), aff'd., 131 N.J.Super. 37, 328 A.2d 246 (App.Div.1974). In connection with administrative bodies, the term means "willful and unreasoning action, without consideration and in disregard of circumstances." Ibid.
Our Supreme Court has noted that
if there is any fair argument in support of the course taken [by the agency] or any reasonable ground for difference of opinion among intelligent and conscientious officials, the decision is conclusively legislative, and will not be disturbed unless they are corrupt, arbitrary or illegal. Doubts held by the court as to *999 the wisdom of the administrator's decision do not alter the case.
[Flanagan v. Dep't of Civil Serv., 29 N.J. 1, 12, 148 A.2d 14 (1959).]
The Court has stated that "courts are not free to substitute their judgment as to the wisdom of a particular administrative action for that of the agency so long as that action is statutorily authorized and not otherwise defective because arbitrary or unreasonable." Newark v. Natural Res. Council in Dep't of Envtl. Prot., 82 N.J. 530, 539, 414 A.2d 1304 (1980) (internal quotation omitted).
Consequently, we are satisfied that the agencies were able to reasonably conclude, after thoroughly reviewing the preliminary environmental impact statement, receiving and digesting the public comments thereto, and after applying their expertise to the evidence in the record, that with appropriate and detailed conditions and provisions for enforcement and monitoring they could render an opinion and recommendation concerning the Xanadu project. Their approach has obviously resulted in this appeal and is open to debate, but it is not arbitrary or capricious and, therefore, given our standard of review, it is not in error.

C. Did The Agencies Lack Authority To Issue A Conditional Approval So That Appropriate Supporting Evidence Could Be Thereafter Submitted (Sierra points III.A., III.B., III.E.; Hartz's point VI.A.)?

Sierra and Hartz contend that the agencies had no authority to allow submission of critical information at a later date and conditionally approve a development project; they note that such a conditional approach on key elements is prohibited under the MLUL. Sierra asserts that authority to grant a conditional approval "must originate from the applicable statute or regulation," citing to Crema, supra, 94 N.J. at 296-98, 463 A.2d 910.
Sierra maintains that deferral of Xanadu's traffic, air quality, and stormwater issues also subverts the procedural protections due as described in the McCrane opinion because interested members of the public will never have a chance to comment on the new information to be generated regarding those important topics since the development was approved before these studies were completed. The joint consultation report suggestion that the missing issues would be addressed during subsequent permitting processes was flawed, say Sierra and Hartz, because none of the referenced sixteen permitting processes implicate the key missing transportation and air quality analyses.
The Crema case cited by Sierra involved NJDEP's review under the Coastal Area Facility Review Act (CAFRA), N.J.S.A. 13:19-1 to -21, of a large scale residential and commercial development in an environmentally sensitive coastal area property. Crema, supra, 94 N.J. at 289, 463 A.2d 910. NJDEP granted a permit approving the "concept" of the development, but not authorizing any construction until all the statutory and regulatory requirements were met. Ibid. Ruling on a successful challenge to that action, we held that neither CAFRA nor the NJDEP's regulations allowed for a "conceptual approval." Ibid. (quoting Crema v. New Jersey Dep't of Envtl. Prot., 182 N.J.Super. 445, 452, 442 A.2d 630 (App.Div.1982)).
Discussing whether NJDEP's action could be recognized as a "conditional permit," the Court distinguished Public Interest Research Group, Inc. v. State, Dept. of Environmental Protection, 152 N.J.Super. 191, 377 A.2d 915 (App.Div.), certif. denied, 75 N.J. 538, 384 A.2d 517 (1977), writing:
There, the Appellate Division sustained a permit to construct a nuclear reactor *1000 facility subject to the condition that specific additional criteria be satisfied before the commencement of actual construction. We agree with the Appellate Division's determination below that Public Interest Research Group, supra, is distinguishable because the record of that case contained evidence sufficient to sustain DEP's determination that the statutory criteria for construction of the project had been "basically satisfied." [Crema v. New Jersey Dep't of Envtl. Prot., 182 N.J.Super. 445, 451, 442 A.2d 630 (1982), modified, 94 N.J. 286, 463 A.2d 910 (1983)]. In this case, the evidence was insufficient to support the necessary findings required under N.J.S.A. 13:19-10 and -11 for the issuance, or conditional issuance, of any construction permit. In fact, the permit in this case purported to postpone an applicant's satisfaction of the necessary findings on the "legislated requirements [until] some later time." Crema, supra, 182 N.J.Super. at 452, 442 A.2d 630.
[Crema, supra, 94 N.J. at 296-97, 463 A.2d 910.]
The Crema Court considered the "conceptual review" approach to be an implied power of NJDEP under CAFRA, but found that NJDEP could not exercise that power through adjudication, but rather needed to promulgate rules to implement that power. Id. at 303, 463 A.2d 910. Thus the Court held
that the conceptual review and approval of proposed developments, to the extent the exercise of this authority purports to establish enforceable rights beyond those now provided by the informal review regulations, require advance promulgation of regulatory standards, both substantive and procedural. These standards should be determined by agency rulemaking in order that the criteria that underlie their formulation and application can be properly developed and expounded with the maximum involvement of the general public. The absence of such regulations is fatal to the agency actions undertaken in these proceedings. Accordingly, on these grounds the conceptual approval must be considered invalid.
[Ibid.]
A clear distinction between the CAFRA filing before the Crema Court and the present situation is the regulatory landscape upon which the issue is presented. In Crema, the issue was a granting of a required permit, an approval to commence a project. In this case, we are dealing with the issuance of a non-binding opinion following a consultation. While no regulations have been promulgated to guide the consultation roles of NJMC and NJDEP when NJSEA seeks to develop its Meadowlands facilities, prior opinions have contained conditions and judicial review of the prior development submissions have allowed for significant flexibility.
Because the section 23 and section 5(x) consultations seek an opinion and recommendations and not an approval and because there is no statute defining the nature, scope, or limitations concerning any opinion to be produced, we see no reason why conditions may not be attached to any opinion rendered.

D. Were The Approvals Invalid Because The Agencies Failed To Provide Adequate Notice And Opportunity For Comment Upon The Hearing Officers' Report Prior To Its Adoption By The Agencies (Sierra points IV.A., IV.B., and IV. C.)?

Sierra makes two arguments aimed at alleged procedural shortcomings. Sierra's first argument is that "the NJDEP made substantive changes to the Hearing Officers' *1001 Report based on information that was not made available to the public." General principles of administrative law, argues Sierra, prohibits an agency from making findings of facts based upon materials not introduced in the public record.
Sierra supports this argument with cases that hold the agencies could not rely on any evidence outside the record. Pa. R.R. Co. v. N.J. State Aviation Comm'n, 2 N.J. 64, 65 A.2d 61 (1949); High Horizons Dev. Co. v. State, 120 N.J. 40, 575 A.2d 1360 (1990). Those cases, though, are inapposite to this case because this case concerns a quasi-legislative hearing. The preclusion against use of material outside the record as advanced by Sierra is clearly limited to statutorily required quasi-judicial hearings. Bhd. of R.R. Trainmen v. Palmer, 47 N.J. 482, 487, 221 A.2d 721 (1966).
Sierra's second argument is that it was error for the agencies to preclude the public from filing exceptions, objections, or replies to the hearing officers' joint consultation report, and for not providing sufficient time for the public to review the joint consultation report before NJMC acted upon it. Sierra asserts that under the New Jersey Administrative Procedure Act (APA), after an administrative law judge engages in factfinding and makes a recommended decision for review by the agency head, the parties of record are given the opportunity to file exceptions, objections, or replies to the recommended decision. N.J.S.A. 52:14B-10(c). However, the present matter did not involve one where a party has a statutory or constitutional right to a trial-type hearing, very much like the situation in In re Dep't of Envtl. Prot. Decision on Application of Triarch Corp. (In re Triarch Corp.), 139 N.J.Super. 514, 516, 354 A.2d 652 (App.Div.1976). In that case, we held that The Wetlands Act of 1970, N.J.S.A. 13:9A-1 to -10, "prescribe[d] a public hearing for the purpose of providing an opportunity for interested persons to present their views. The hearing is not adjudicatory and is not required to be conducted as a `contested hearing' under the Administrative Procedure Act." In re Triarch Corp., supra, 139 N.J.Super. at 516, 354 A.2d 652. We found there that under the statute and its implementing regulations "fairness and overall administrative balance and soundness are reasonably secured," even without the additional right to file exceptions that the APA's procedures would have allowed. Id. at 517, 354 A.2d 652. That analysis is dispositive of Sierra's second argument. Sierra was afforded adequate opportunity to voice its concerns in this quasi-legislative proceeding.

E. Did NJDEP Commissioner's Approval Of "Early Start" Construction Activities Require Invalidation Of The DEP's Subsequent Approval (Hartz's point IV)?

Hartz contends that the Commissioner was without authority to grant "early start" approval for construction activities on the Xanadu site.
NJSEA asserts that this argument has no place in the present appeal, because Hartz appealed from only the joint consultation report and the Commission's report, neither of which addressed this "early start" issue. We agree and will not entertain this argument.

F. Was NJDEP Approval Order A Nullity Insofar As It Purported To Unilaterally Modify The Conditions In The Joint Consultation Report As Approved By NJMC's Resolution No. 06-04 (Hartz's point III)?

Hartz argues that NJDEP Commissioner's "unilateral attempt to modify" *1002 NJMC's approval of the joint consultation report, and the conditions contained within that report, is "null and void, as ultra vires" under N.J.S.A. 5:10-23. Hartz asserts that where the agencies disagree, the more stringent requirements should prevail.
N.J.S.A. 5:10-23 requires a consultation by NJSEA with each of the NJMC and NJDEP. There is no requirement that there be a joint report or unanimity between the two agencies. While the Supreme Court in McCrane noted there was no objection to a joint hearing, there is no requirement for a joint unanimous report from the two agencies. Consequently, each of the agencies may render their consultative report to NJSEA for its consideration without there being unanimity between them. The NJDEP's Commissioner's action of course is limited to his agency and not NJMC. To the extent there are differences between the two agencies, NJSEA must determine in a reasonable exercise of its discretion how to proceed. The fact that they are not unanimous in no way makes the joint consultative report null and void or ultra vires.

G. Were The Approvals Contrary To The Public Trust Doctrine (Hartz's point V)?

Hartz argues that NJMC and NJDEP violated the public trust doctrine by allowing the filling of the on-site wetlands.
The public trust doctrine derives from the English common law principle that all of the land covered by tidal waters belongs to the sovereign held in trust for the people to use. Raleigh Ave. Beach Ass'n v. Atlantis Beach Club, Inc., 185 N.J. 40, 51-52, 879 A.2d 112 (2005). "Although the states have the inherent authority to convey riparian grants to private persons, the sovereign never waives its right to regulate the use of public trust property." Karam v. State, 308 N.J.Super. 225, 240, 705 A.2d 1221 (App.Div.1998) (internal citation omitted). Referring to the common public trust property, including "all navigable rivers in which the tide ebbs and flows and the coasts of the sea," the water and land under the water, and riparian interests in tidally flowed lands, our Supreme Court has recognized that "`[t]he State can no more abdicate its trust over property in which the whole people are interested ... than it can abdicate its police powers....'" Matthews v. Bay Head Improvement Ass'n, 95 N.J. 306, 319, 471 A.2d 355 (1984) (quoting from Illinois Central R.R. v. Illinois, 146 U.S. 387, 453, 13 S.Ct. 110, 118, 36 L.Ed. 1018, 1043 (1892)).
In this case, Hartz has failed to show that the public trust doctrine is violated by allowing filling of the wetlands on the Sports Complex site. The opportunity to forever preserve the more expansive wetlands comprising the Empire Tract as part of the Xanadu project is a valid means to serve the public interest concerning its lands below and adjacent to tidally flowing and fresh waters. Accordingly, we find no violation of the public trust doctrine.

IV. ADDITIONAL ARGUMENTS

To the extent we have not specifically addressed any argument raised by Sierra or Hartz, we find them to be without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

V. CONCLUSION

In conclusion, after thoroughly reviewing the record in this matter, we find that the consultation by NJDEP and NJMC was in accordance with N.J.S.A. 5:10-5(x) and -23, as well as the requirements outlined by our Supreme Court. The record before the agency was substantial and supports *1003 the agencies' recommendations, taken together with the conditions found to be necessary by the agencies. The agencies' conclusions were reasonably arrived at, such that we cannot conclude that they were arbitrary. Accordingly, we affirm in all respects.
Affirmed.
NOTES
[1] The Arena was formerly known as the Continental Airlines Arena.
[2] We previously heard an appeal regarding the award of the contract. Hartz Mountain Indus., Inc. v. N.J. Sports & Exposition Auth., 369 N.J.Super. 175, 180, 848 A.2d 793 (App. Div.), certif. denied sub. nom. Braha v. N.J. Sports & Exposition Auth., 182 N.J. 147, 862 A.2d 56 (2004).
[3] See e.g., N.J.S.A. 5:10-23 (NJSEA); N.J.S.A. 12:6B-4 (Office of Maritime Resources in the Department of Transportation (DOT)); N.J.S.A. 13:13-3.2(DOT); N.J.S.A. 13:20-9 (Highlands Water Protection and Planning Council); N.J.S.A. 13:20-24 (Site Improvement Advisory Board and Commissioner of Community Affairs); N.J.S.A. 26:2C-8.47 (Motor Vehicle Commission (MVC)); N.J.S.A. 26:2C-8.49 (Department of Law and Public Safety); N.J.S.A. 39:8-64(MVC).
[4] See e.g., N.J.S.A. 4:1C-10.3; N.J.S.A. 13:1E-6; N.J.S.A. 18A:26-2.9; N.J.S.A. 19:8-3.4; N.J.S.A. 21:2-29.1; N.J.S.A. 27:1A-5.10.
[5] For examples of a defined regulatory consultation process, see 40 C.F.R. 25.4(d) issued pursuant to the Federal Clean Water Act, 33 U.S.C. 1251(e) or 50 C.F.R. 402.14 outlining a two-tier consultation process that is required under the Endangered Species Act, 16 U.S.C. § 1533.